Filed 2/13/14  P. v. Murray CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CONRAD ROBERT MURRAY,<br><br>    Defendant and Appellant. | B237677<br><br>(Los Angeles County<br>Super. Ct. No. SA073164)<br><br>**ORDER MODIFYING OPINION;<br>NO CHANGE IN JUDGMENT** |

THE COURT:


It is ordered that the opinion filed herein on January 15, 2014, and not certified for publication, be modified as follows:

1.  The following generic drugs are capitalized in the opinion and should not be capitalized: clonazepam; diazepam; ephedrine; flumazenil; flurazepam; lidocaine; lorazaepam; midazolam; propofol; temazepam; tizanidine; trazodone; and triazolam.

2.  On page 4, footnote 4, the 1st sentence states: "Drugs may be administered intravenously by injection using two different methods."

It should state: "Drugs may be administered intravenously by injection using different methods."

_____

*The use of boldface throughout this modification order is only to highlight changes and for ease of reading of this order.

3. On page 5, continuation of footnote 4, 2nd paragraph, line 1 states: "Under a second method – the 'drip' or 'infusion' – the dose is slowly dripped."

It should read: "Under **another** method **(that the prosecution's expert testified appellant used on the day Mr. Jackson died)** – the 'drip' or 'infusion' – the dose is slowly dripped."

4. On page 7, footnote 7 states: "During his interview with police on June 27, appellant stated that during the three days leading up to Mr. Jackson's death, he had been trying to gradually "wean" Mr. Jackson from Propofol. He claimed that on the first night, he administer Lorazepam and Midazolam, and he also gave Mr. Jackson a slower drip of Propofol. He stated that on the second night, he gave Mr. Jackson no Propofol but gave him Lorazepam and Midazolam, and Mr. Jackson was able to get some sleep. On night three, Mr. Jackson died."

It should state: "During his interview with police on June 27, appellant stated that during the three days leading up to Mr. Jackson's death, he had been trying to gradually 'wean' Mr. Jackson from Propofol. He claimed that on the first night, he administer**ed** **l**orazepam and **m**idazolam, and he also gave Mr. Jackson a slower drip of **p**ropofol. He stated that on the second night, he gave Mr. Jackson no **p**ropofol but gave him **l**orazepam and **m**idazolam, and Mr. Jackson was able to get some sleep. On **day** three, Mr. Jackson died."

5. On page 10, 3rd paragraph, the sentence starting at line 6 states: "Paramedics believed that appellant's statement that Mr. Jackson had recently experienced cardiac arrest was inconsistent with their observations of Mr. Jackson's appearance and condition."

It should state: "Paramedics believed that appellant's statement that Mr. Jackson had recently experienced **an** arrest was inconsistent with their observations of Mr. Jackson's appearance and condition."

6. On page 16, 1st paragraph, line 4, "acts and omission" should read: "acts and omissions."

7. On page 16, 2nd paragraph, lines 2-3 state: "Dr. Kamanger is a board certified doctor and expert in internal medicine, pulmonary, critical care, and sleep medicine physician."

It should state: "Dr. Kamanger is a board certified doctor and expert in internal medicine, pulmonary, critical care, and sleep medicine."

8. On page 17, 1st paragraph, line 11 states: "(7) failing to immediately summon help by calling"

It should state: "(7) failing to immediately summon help by calling **9-1-1;**"

9. On page 20, 3rd paragraph, line 1 states: "Appellant also presented evidence from an expert Dr. Robert Waldman who"

It should state: "Appellant also presented evidence from an expert – Dr. Robert Waldman – who"

10. On page 21, the 1st full paragraph states: "In describing his view that Mr. Jackson injected himself with the lethal dose of Propofol, Dr. White theorized that appellant drew up a syringe of Propofol and Lidocaine and then left Mr. Jackson and the syringe of Propofol in the room unattended for some period time. Dr. White believed Mr. Jackson injected himself after 11:40 a.m., when appellant was on the 30-40 minute telephone call. Dr. White assumed that the following series of events occurred: Mr. Jackson got out of bed, wheeled the I V stand while holding the urine bag (which he was attached by the condom catheter), got the syringe of Propofol somewhere in the room, returned to bed and then he self-administered the fatal dose of 25 milligrams of Propofol at the Y-connector. Dr. White opined that Mr. Jackson would have died instantly upon self-injection."

It should state: "In describing his view that Mr. Jackson injected himself with the lethal dose of **p**ropofol, Dr. White theorized that appellant drew up a syringe of **p**ropofol and **l**idocaine and then left Mr. Jackson and the syringe of **p**ropofol in the room unattended for some period **of** time. Dr. White believed Mr. Jackson injected himself after 11:40 a.m., when appellant was on the 30-40 minute telephone call. Dr. White assumed **(as one possible scenario)** that the following series of events occurred: Mr. Jackson got out of bed, wheeled the I V stand **with a** urine bag **(attached by the condom catheter) attached to his leg**, got

3

the syringe of **p**ropofol somewhere in the room, returned to bed and then he self-administered the fatal dose of 25 milligrams of **p**ropofol at the Y-connector.  Dr. White opined that Mr. Jackson would have died instantly upon self-injection."

11.  On page 21, 3rd full paragraph, line 6 states: "Dr. Safer"; it should state: "Dr. **Shafer**."

12.  On page 28, 1st full paragraph, line 4 states: "that appellant was giving appellant nightly infusions of Propofol"

It should state: "that appellant was giving **Mr. Jackson** nightly infusions of **p**ropofol."

13.  On page 29, line 1 states: "Dr. Safer"; it should state: "Dr. **Shafer**."

14.  On page 32, 1st paragraph, line 6 states: "Mr. Jackson got out of bed, wheeled the IV stand, while holding the urine bag,"

It should state: "Mr. Jackson got out of bed, wheeled the IV stand, **with the urine bag attached to his leg**,"

15.  On page 33, 1st paragraph, line 3 states: "that appellant ask Alvarez"; it should state: "that appellant ask**ed** Alvarez"

16.  On page 33, footnote 21, line 1 states: "method to administered Lidocaine"; it should state: "method to **administer lidocaine**"

17.  On page 35, 2nd paragraph, 1st sentence states: The court denied the motion, finding that there was no justification for "this type of extraordinary motion.

It should state: The court denied the motion, finding that there was no justification for "this type of extraordinary motion.**"**

18.  On page 40, line 1 states: "it did not contained Lidocaine"; it should state: "it did not **contain lidocaine**"

19.  On page 42, last paragraph, lines 1-2 state: "At the hearing on the motion, the prosecutor stated his belief that at trial the appellant"; it should state: "At the hearing on the motion, the prosecutor stated his belief that at trial appellant"

4

20.  On page 44, line 13 states: "Mr. Jackson in the months and weeks before his death is tangential to the material issues"; it should state: "Mr. Jackson in the months**, weeks, and days** before his death is tangential to the material issues"

21.  On page 45, line 3 states: "Exclusion of these witnesses did not prevent appellant from presenting this theory that"; it should state: "Exclusion of these witnesses did not prevent appellant from presenting **his** theory that"

22.  On page 54, 2nd paragraph, line 2 states: "Defendant"; it should state: "Appellant"

23.  On page 60, line 2 states: "(1) crime involved"; it should state: "(1) **the** crime involved"

24.  On page 63, 1st full paragraph, line 5 states: "appellant challenge would"; it should state: "**appellate** challenge would"

25.  On page 64, 2nd full paragraph, line 3 states: "defendant made no objection"; it should state: "**appellant** made no objection"

26.  On page 67, 2nd full paragraph, line 2 states: "defendant's due process claim"; it should state: "**appellant's** due process claim."


Appellant's petition for rehearing is denied.  The foregoing does not change the judgment.


**PERLUSS, P. J.**                    **WOODS, J.**                    **ZELON, J.**

Filed 1/15/14 (unmodified version)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B237677 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA073164) |
| v. | |
| CONRAD ROBERT MURRAY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Michael Pastor, Judge. Affirmed.

Valerie G. Wass for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Victoria B. Wilson, Deputy Attorney General, for Plaintiff and Respondent.

_____

Appellant Conrad Robert Murray appeals from the judgment upon his conviction and sentence on one felony count of involuntary manslaughter in violation of Penal Code section 192, subdivision (b) for causing the death of Michael Jackson. In this court appellant asserts that the trial court and his counsel committed various prejudicial errors which warrant the reversal of his conviction and sentence. Specifically he complains that: (1) sufficient evidence did not support the jury's guilty verdict on the manslaughter charge; (2) the court erred in denying his post-verdict motion to test one of the trial exhibits and that his counsel was ineffective in failing to seek testing of the exhibit during the trial and in failing to more thoroughly question a prosecution expert witness about the exhibit; (3) the trial court erred in excluding certain evidence including the testimony of Mr. Jackson's dermatologist and the doctor's staff, evidence of Mr. Jackson's financial condition at the time of his death and the contract between Mr. Jackson and AEG Live Concerts West ("AEG"); and (4) the court erred in denying his motions to sequester the jury and to exclude television cameras from the courtroom. With respect to his sentence, appellant argues that the trial court abused its discretion by imposing a sentence for the high term of four years. As we shall explain, none of appellant's claims warrants reversal of the judgment. Accordingly, we affirm.

## *FACTUAL AND PROCEDURAL BACKGROUND*

### Michael Jackson's Career and "This Is It" Tour

Michael Jackson was an award-winning entertainer who had a career in the music and the entertainment industry that spanned more than 40 years. At the time of his death in 2009, he lived in a home in Los Angeles on North Carolwood Drive with his three children. Mr. Jackson employed a staff at the residence which included, among others, personal assistants and a security team. The home had security gates that were monitored 24 hours a day.

Mr. Jackson had a number of successful concert tours in the 1990's. In 2009, after a hiatus from the stage and touring, Mr. Jackson decided to launch a new worldwide tour, which came to be called: "This Is It." Mr. Jackson wanted to share his music with his children, his fans as well as address other global issues that were significant to him.

2

Mr. Jackson worked with AEG to develop the "This Is It" tour. AEG served as the producer and promoter of the tour. Mr. Jackson had planned to begin the tour in London, England in July 2009. Between July 2009 through March 2010, it was planned that Mr. Jackson would perform a total of 31 shows, and thereafter Mr. Jackson and AEG would collaborate on a multi-city tour.

During May 2009 and June 2009, tour rehearsals were planned to occur in the Los Angeles area; in June 2009, rehearsals were held at the Staples Center in downtown Los Angeles. Mr. Jackson's security team transported him to and from his residence to rehearsal every day; rehearsal began in the afternoon and ended late at night.

### Appellant and his Relationship to Mr. Jackson

Appellant is a cardiologist with a specialty in internal medicine. He had practiced medicine in Texas and Las Vegas. Appellant first met Mr. Jackson in Las Vegas in 2006, when appellant treated Mr. Jackson and his children for the flu.

According to appellant he did not regularly treat Mr. Jackson. However, while the planning for the tour was underway, appellant was invited by Mr. Jackson to serve as his personal physician for the "This Is It" tour. Appellant agreed to $150,000 a month in payment to serve as Mr. Jackson's doctor during the tour.

Appellant's treatment of Mr. Jackson took place at Mr. Jackson's home on a daily basis beginning in April 2009.[1] At the end of the rehearsal each night appellant would be summoned from his apartment[2] to Mr. Jackson's residence to be present when Mr. Jackson arrived home; appellant would arrive at the residence and stay the night. Mr. Jackson's

---

[1] Appellant did not maintain any medical records for Mr. Jackson during the April to June 2009 time period.

[2] Appellant lived with his girlfriend in Santa Monica. Almost every night, appellant would leave the Santa Monica apartment to attend to Mr. Jackson as his physician, and he would return to the apartment the next morning.

3

security personnel indicated that they saw appellant on a regular basis and they believed appellant was staying overnight nearly every night.

### Events in the Months and Weeks Prior to Mr. Jackson's Death

In 2008, appellant developed a relationship with a pharmacy in Las Vegas, which agreed to take orders by telephone from appellant for pharmaceuticals and to ship those orders to appellant's office in Las Vegas.

Beginning in April 2009, appellant began to place orders at the pharmacy for large quantities of Propofol, a sedative that can induce general anesthesia. Appellant ordered multiple 100-milliliter size and 20-milliliter size Propofol vials, tubes of Benoquin, a skin whitening cream, and saline bags. At appellant's request the shipments were forwarded to appellant's "medical office"[3] in Santa Monica. In April, May and June 2009, appellant also ordered large quantities of Lorazepam in injectable form (a benzodiazepine, or sedative, available in pill and injectable form) and Midazolam (a benzodiazepine, or sedative, available in injectable form only), Flumazenil (a benzodiazepine antagonist) and Lidocaine (anesthetic, both in cream and injectible form) from the pharmacy. Like the prior orders, these orders were shipped to appellant's Santa Monica address. In sum, from April to June 2009, appellant ordered and was shipped 255 vials of Propofol (totaling 155,000 milligrams or 4.09 gallons), 20 vials of Lorazepam, and 60 vials of Midazolam.

Nearly every night, for two months prior to Mr. Jackson's death, appellant administered Propofol to Mr. Jackson in Mr. Jackson's private room in his home. Mr. Jackson's bedroom was not equipped with the types of medical monitoring devices that one would expect to find in a medical facility where general anesthesia such as Propofol would normally be administered. Appellant would first inject Mr. Jackson with 25 or 50 milligrams of Propofol then he would start a Propofol "infusion" or "drip."[4] According to appellant, Mr.

---

[3]   The address appellant provided to the pharmacy was his residential address, not a medical office.

4

Jackson handled it "fine." Appellant claimed Mr. Jackson suggested the idea of receiving Propofol because he believed that it was the only drug that worked for him. Mr. Jackson told appellant that other doctors had given Propofol to him when he was on tour in the past. Mr. Jackson said that doctors had even allowed him to inject himself and he liked to "push" (i.e.,

---

4 Drugs may be administered intravenously by injection using two different methods. One method involves giving a "bolus" dose by injecting the entire dose quickly with a syringe directly into the Y-connector (or the Y-port, where a drug can be administered) attached to the patient's IV.

Under a second method – the "drip" or "infusion" – the dose is slowly dripped. To administer a drug such as Propofol by the "drip" or "infusion" method also requires the use of IV tubing and a saline bag. Medical experts testified at trial that a bag of saline has a port at the bottom where a needle or a "spike" (a thick plastic needle) can be attached and IV tubing is connected to the spike. A smaller needle is attached to the other end of the IV tubing and the smaller needle is then inserted in the patient. The bag of saline is then attached to and hangs from a stand. Working with the force of gravity, this set-up allows the saline to flow through the saline bag, through the spike, and down through the tubing into the patient.

The "infusion" method requires the use of three lines of IV tubing. The first line is the "saline" line which consists of a bag of saline and IV tubing that connects the bag of saline to a Y-connector at one of the forks in the top of the connector and a second line of IV tubing (i.e., the "Propofol infusion" line) connected to the to the top of the other fork in the Y-connector. The third line of IV tubing is connect to the bottom of the Y-connector; the third line is attached to a needle and inserted into the patient.

Propofol is packaged in a glass vial with a rubber stopper. To remove Propofol from the vial requires puncturing the stopper. To administer Propofol using the "infusion method" requires that a spike to be attached to the rubber stopper in the bottle of Propofol and the IV tubing—the Propofol infusion line--be attached to the other end of the spike. The Propofol infusion line is the connected to the Y-connector. Thereafter the Propofol bottle is suspended from the IV stand. The IV tubing used for the Propofol infusion line must be "vented" IV tubing (which allows air to pass into the bottle and for the Propofol flow from the bottle). The vented IV tubing, which is small enough to fit in the palm of a hand, transports the Propofol from the Propofol bottle to Y-connector. At the joint of the Y-connector where the saline IV line and the Propofol infusion line meet, Propofol, mixes with the saline. The saline which acts as a carrier solution, flows through the third line of IV tubing of the saline line attached to the bottle of the Y-connector and into the patient.

5

inject) it. Appellant stated that he would not allow Mr. Jackson to inject himself with the drug.

In mid-June 2009, Mr. Jackson missed a number of tour rehearsals and arrived to at least one rehearsal, appearing to be unwell and "incoherent." His condition concerned those working with him on the show; he did not appear to be "fully engaged" or sufficiently prepared for rehearsal.

On June 19, 2009, Kenneth Ortega, the chorographer and director for the tour expressed concern that Mr. Jackson was ill, had lost weight, needed to be psychologically evaluated and that there was "no one taking responsibility, caring for him. . . ." On June 20, appellant, Mr. Jackson, Ortega and several others involved in the production met to discuss Mr. Jackson's health and mental condition. Appellant said that he was taking care of Mr. Jackson's health. Appellant and Mr. Jackson assured everyone that Mr. Jackson was physically and emotionally capable of handling the show. At the next rehearsal on June 23, 2009, Mr. Jackson was energized and gave a good performance.

**June 24 and June 25, 2009**

On the evening of June 24, 2009, Mr. Jackson had a rehearsal at the Staples Center. He appeared energized and engaged. Mr. Jackson was happy with his performance.

Around midnight on June 25 after the rehearsal, Mr. Jackson left the Staples Center to return to his home. Appellant was present, waiting for Mr. Jackson to arrive. At 1:00 a.m., Mr. Jackson arrived at the residence. After briefly greeting his fans outside the gates of his home, Mr. Jackson entered the residence and proceeded upstairs where appellant was waiting for him in his private suite. According to appellant,[5] Mr. Jackson said he was tired and he took a shower. Mr. Jackson wanted to sleep but was unable to fall asleep. Appellant put an

---

[5] Appellant was the only person with Mr. Jackson from the time Mr. Jackson entered his bedroom in the early morning hours of June 25 until Mr. Jackson died. Appellant did not testify during his trial, however, he was interviewed by police on June 27, 2009, and the recording of this interview was played for the jury during the trial. During his police interview he gave an account of what occurred while he was alone with Mr. Jackson in the hours before his death.

6

IV on Mr. Jackson's leg because Mr. Jackson suffered from dehydration. He lost fluids when he danced. Appellant stated that he gave Mr. Jackson a 10-milligram tablet of Valium. At about 2:00 a.m., appellant gave Mr. Jackson 2 milligrams of Lorazepam by IV.[6] Mr. Jackson was still wide awake and complained that he could not sleep. At 3:00 a.m., appellant stated that he gave Mr. Jackson 2 milligrams of Midazolam by injecting the drug slowly. But Mr. Jackson was still awake. Mr. Jackson tried to meditate and after 15 to 20 minutes, he fell asleep, but then woke up again about 10 minutes later.

At 4:30 a.m., Mr. Jackson still had not slept and at about 5:00 a.m. appellant gave Mr. Jackson another 2-milligram dose of Lorazepam. The additional dose did not help. Mr. Jackson complained he would be unable to perform at rehearsal that day and that it would have to be cancelled. At 7:30 a.m., appellant gave Mr. Jackson another 2 milligrams of Midazolam by slowly infusing it, but it did not prove effective.

At about 10:00 a.m., Mr. Jackson apparently told appellant that "I'd like to have some milk" (by which he was referring to Propofol). Appellant claims that Mr. Jackson pled: "Please, please, give me some milk so that I can sleep, because I know that this is all that really works for me." Appellant asked Mr. Jackson how much sleep he expected to get with Propofol. Mr. Jackson said it did not matter when he got up. Appellant told Mr. Jackson that he "needed to be up no later than noon." Mr. Jackson responded that the rehearsal would have to be cancelled.

Around 10:40 a.m., appellant claims he gave Mr. Jackson 25 milligrams of Propofol.[7] He drew it from a bottle, diluted it with Lidocaine (which was used to eliminate the burning

---

[6] Appellant turned off the IV and injected the medication at the port over a period of two to three minutes. Once the Lorazepam was inside the tube, appellant unclamped the line to have the IV continue to drip.

[7] During his interview with police on June 27, appellant stated that during the three days leading up to Mr. Jackson's death, he had been trying to gradually "wean" Mr. Jackson from Propofol. He claimed that on the first night, he administer Lorazepam and Midazolam, and he also gave Mr. Jackson a slower drip of Propofol. He stated that on the second night, he gave Mr. Jackson no Propofol but gave him Lorazepam and

7

sensation caused by the injection of Propofol), and slowly infused it over the span of three to five minutes. According to appellant he expected the effect to last about 15 minutes. Appellant said that Mr. Jackson fell asleep after the drug was administered. Appellant claimed that when he administered Propofol he also placed Mr. Jackson on oxygen and used a pulse oximeter to monitor his heart rate and oxygen saturation level.[8] Appellant stated that Mr. Jackson's oxygen saturation level was good and heart rate was stable after he administered the drug.

Appellant said he would have administered more Propofol to Mr. Jackson that evening if he had not already given Mr. Jackson the other medications. Appellant stated that he monitored Mr. Jackson until he felt comfortable leaving him alone. Appellant stated that he left the room to use the restroom and stated that he was away from Mr. Jackson for about two minutes.[9]

Appellant claimed that when he returned to check on Mr. Jackson it appeared that he was not breathing. Appellant looked at the pulse oximeter, which indicated Mr. Jackson's heart rate was 122 beats per minute. Appellant thought that he could feel a "thready pulse" in the femoral region of Mr. Jackson's body.

Appellant started to perform CPR and mouth-to-mouth resuscitation on Mr. Jackson on the bed. Appellant did not immediately summon help. While doing CPR, appellant called

---

Midazolam, and Mr. Jackson was able to get some sleep. On night three, Mr. Jackson died.

[8]     The pulse oximeter appellant used was not intended for continuous monitoring nor was it equipped with an alarm, which if activated could indicate a problem with the patient. According to expert medical testimony presented at trial using a proper pulse oximeter could have saved Mr. Jackson's life.

[9]     The records from appellant's IPhone that morning indicate that while he was purportedly "monitoring" Jackson's condition and vital signs, he also received and placed numerous telephone calls, e-mails and text messages. In fact on June 25, 2009, from between 6:00 a.m. until 11:51 a.m., appellant made or received 11 telephone calls to various business associates, patients and friends that lasted a total of approximately 78 minutes; one of the telephone calls made after 11:00 a.m. lasted 30-40 minutes. He also sent and/or received eight e-mail and text messages.

Mr. Jackson's personal assistant with his cellular telephone, and asked him to send security to the room, but did not ask him to call 9-1-1. Mr. Jackson had no pulse and was not breathing. Between 12:05 and 12:10 p.m., Appellant ran to the kitchen and told the chef that he had an "emergency" and that he wanted security to come immediately.

Alberto Alvarez, Mr. Jackson's "director of logistics," came upstairs to the bedroom. When Alvarez walked into Mr. Jackson's bedroom, he saw appellant giving chest compressions to Mr. Jackson. Mr. Jackson lay on his back on the bed with his hands extended out. Alvarez saw a condom catheter attached to Mr. Jackson. Alvarez also saw an IV stand, oxygen tubing attached to Mr. Jackson's nose and an Ambu bag (a self-inflating resuscitator) on the floor. He did not see medical monitoring equipment in the room.

Appellant said he needed to get Mr. Jackson to a hospital. Mr. Jackson's children then entered the bedroom and became upset; Alvarez ushered them out. Alvarez asked appellant what was wrong and appellant responded that Mr. Jackson "had a bad reaction." According to Alvarez, appellant gave him vials from the nightstand and said, "Here, put these in a bag." Alvarez grabbed a plastic bag sitting on a chair and put the vials in the bag. Appellant then instructed Alvarez to place the bag in another bag and Alvarez did as instructed.

Appellant then directed him to take the bag hanging from the IV stand and place it in a blue bag. Alvarez detached the saline bag from the stand. Alvarez saw a bottle inside the saline bag, resting on the bottom of the saline bag and also saw a milky-white substance at the bottom of the saline bag. The bottle looked like a 100-milliliter Propofol bottle. Alvarez stated that the bottle was sitting slightly sideways with the stopper pointing toward the bottom of the saline bag. Alvarez saw another apparatus attached to the bottom of the saline bag and saw the milky-white substance in the apparatus as well. Alvarez placed the saline bag inside the blue bag, as appellant had instructed. Alvarez saw a second saline bag hanging from the IV stand, but appellant did not ask Alvarez to remove that bag.

After Alvarez collected the vials and the saline bag, appellant told Alvarez to call 9-1-1. According to appellant, he also gave Mr. Jackson Flumazenil to reverse the effect of the benzodiazepines (the Diazepam, Lorazepam, and Midazolam). About 20 minutes elapsed between the time appellant found Mr. Jackson and the time the call was placed to 9-1-1.

9

The 9-1-1 operator connected Alvarez to the Fire Department. Based on the instructions from the paramedics, Alvarez and appellant moved Mr. Jackson to the floor of the bedroom. Appellant attached a pulse monitor to Mr. Jackson's finger. Alvarez saw IV tubing coming from the area of the IV stand into Mr. Jackson's leg. Appellant and Alvarez began to administer CPR—Alvarez did chest compressions and appellant administered CPR. Mr. Jackson, however, appeared to be dead.

Paramedics and firefighters arrived at the residence at 12:26 p.m. and proceeded to Mr. Jackson's room. Appellant identified himself to the paramedics as Mr. Jackson's doctor. Appellant appeared to be frantic. In the room paramedics saw an IV stand with a saline bag and an oxygen tank. Attached to Mr. Jackson's body they saw a nasal cannula (a form of giving oxygen where two tubes are placed into the nose), an IV with a saline bag attached to an IV stand, and a condom catheter. They did not see an EKG machine (a heart monitor) or a capnography machine (a machine that measures carbon dioxide from one's breath) or a pulse oximeter. During the resuscitative efforts a paramedic saw three open vials of Lidocaine on the floor.

When asked, appellant stated that Mr. Jackson had no underlying health condition, which according to the paramedic did not make sense given that Mr. Jackson appeared to be underweight, attached to an IV and that vials of medication were on the nightstand. Paramedics questioned appellant about whether Mr. Jackson had been given any medications, to which appellant answer: "No, he's not taking anything." He then added, "I just gave him a little bit of Lorazepam [a sedative] to sleep." Paramedics asked if appellant gave Mr. Jackson any other medication, and appellant said "no." Appellant stated that he was treating Mr. Jackson for dehydration and exhaustion. Appellant never told the paramedics that he had administered Propofol to Mr. Jackson.

Paramedics also asked appellant how long appellant had been in his current condition to which appellant responded: "It just happened right when I called you" or "He has been down for about one minute." Based on appellant's response, paramedics initially believed there was a good chance to save Mr. Jackson. However, all resuscitation and advanced life support efforts proved unsuccessful. Mr. Jackson appeared to be dead. Paramedics believed

10

that appellant's statement that Mr. Jackson had recently experienced cardiac arrest was inconsistent with their observations of Mr. Jackson's appearance and condition. They never saw any sign of life in Mr. Jackson and estimated the time of the arrest was anywhere from 20 minutes to an hour before they had arrived.

During the resuscitative efforts the paramedics had been in contact with UCLA hospital and had received directives from the emergency room doctors at the hospital. The UCLA doctor assigned to the matter authorized the paramedics to pronounce Mr. Jackson dead based on the physical characteristics described and the length of the resuscitative attempts. However, at appellant's request efforts to revive Mr. Jackson continued and they prepared to transfer him to UCLA medical center.

As paramedics prepared to transport Mr. Jackson to UCLA medical center, appellant was observed in Mr. Jackson's room alone with a trash bag in his hand. He was picking up items off of the floor near the nightstand.

At the UCLA hospital, doctors questioned appellant about Mr. Jackson's condition and medications he had been given. Appellant stated that Mr. Jackson had been working long hours and he believed Mr. Jackson was dehydrated. He said he gave Mr. Jackson an IV and administered 4 milligrams of Lorazepam and said he witnessed Mr. Jackson go into arrest. Appellant was asked if he gave Mr. Jackson any other narcotics or sedatives and appellant denied giving Mr. Jackson anything else. Appellant reported that Mr. Jackson's routine medications were Valium (a sedative) and Flomax (medication for an enlarged prostate). He did not mention administering Propofol. Mr. Jackson was pronounced dead and the police and coroner were summoned to the hospital.

### The Investigation

In the early evening of June 25, Elissa Fleak, an investigator with the Los Angeles Coroner's Office, arrived at the hospital. She conducted a brief examination of Mr. Jackson's body, but did not see any obvious sign of cause of death. Fleak took custody of four vials of Mr. Jackson's blood taken at the hospital.

Fleak proceeded to Mr. Jackson's residence and investigated the bedroom where he died. Underneath a nightstand in the bedroom, Fleak found an almost empty 20-milliliter

11

bottle of Propofol. Near the nightstand, Fleak found prescription bottles for Diazepam, Lorazepam, and Flomax and an almost empty bottle of Flumazenil. Fleak found more pharmaceutical containers in a wicker basket near the nightstand, including containers for Temazepam, Tizanidine, Clonazepam, and Trazodone. Fleak saw several oxygen tanks in the bedroom. One tank was on a rolling dolly near the bed. Fleak also saw an Ambu bag and an IV catheter on the floor.

On the nightstand, Fleak found other medical items, including a 10-cc syringe without a needle. Fleak also saw an IV stand with a hanging saline bag and IV tubing draped over the IV pole and recovered what appeared to be a jug of urine sitting on a chair in the bedroom.

During appellant's police interview on June 27, appellant revealed that the items he had used in treating Mr. Jackson on June 25, and that he and Alvarez had gathered up, were in three bags (a Costco bag, a black bag, and a blue bag) inside Mr. Jackson's closet. On June 29, 2009, Fleak recovered the bags from the closet in Mr. Jackson's room.

Inside the small black bag, Fleak found: a blood pressure cuff and three bottles of Lidocaine, two almost empty and one about half full.

Inside the large blue Costco bag , Fleak discovered: (1) a saline bag with a slit (or cut) in it, (the"slit saline bag"); (2) a 100-milliliter vial of Propofol that was "more or less" empty inside the slit saline bag;[10] (3) a 20-milliliter bottle of Propofol; (4) a 10-milliliter vial of Lorazepam; (5) two 10-milliliter bottles of Midazolam; (6) a bloody gauze; (7) a pulse oximeter; and (8) a plastic bag full of medical debris.

Inside the third bag Fleak found, among other items, (1) two full 100-milliliter Propofol bottles; (2) seven 20-milliliter Propofol bottles, four unopened and three opened; (3) three Lidocaine bottles, one unopened and two opened/consumed; and (4) vials of

---

[10] The 100-milliliter vial of Propofol (Exh. 30) had appellant's fingerprint on it. Fleak's notes did not indicate that the Propofol bottle (Exh. 30) was found inside the slit saline bag (Exh. 29); she listed the slit saline bag and the Propofol bottle back to back in her notes as items found. Fleak testified at the preliminary hearing and during the trial that she found the Propofol bottle inside the slit saline bag.

12

Midazolam, bottles of Flumazenil, bottles of 10 milliliters of Lorazepam; and an IV tubing device.

She also recovered items from Jackson's room on the IV stand including a second saline bag, IV tubing, a Y-connector attached to tubing and a syringe with an attached needle from the port of the Y-connector and a spliced section of the end of the I.V. tubing that contained blood.

An autopsy and toxicology tests were conducted on Mr. Jackson's body to determine the cause of his death. These tests revealed that Mr. Jackson had a number of drugs in his system at the time of his death, including Propofol, Lidocaine, Valium, Ativan, Midazolam and Ephedrine.

Toxicology tests also revealed the presence of Propofol and Lidocaine in the syringe found on Mr. Jackson's nightstand and in the distal components (i.e., saline bag, tubing, Y-connector and syringe needle) of the IV stand.

Based on the toxicology findings, appellant's June 27 statement to police, and evidence found at the scene and lack of medical records for Mr. Jackson's treatment on June 25, the coroner's office determined that Mr. Jackson's cause of death was homicide—acute Propofol intoxication with the contributing effect of benzodiazepines. The coroner's conclusion was based on appellant's admission of administering Propofol and benzodiazepines to Mr. Jackson; the conclusion that it was not an appropriate medical indication to give Propofol for insomnia; and the setting of administering Propofol in the home, not a clinic or hospital where medical monitoring devices would be available. The coroner further opined that the circumstances of the case did not support the conclusion that Mr. Jackson self-administered Propofol. The coroner rejected the possibility that that Mr. Jackson woke up and, while under the influence of Propofol and other sedatives, was able to inject himself with Propofol. The coroner explained that, if Mr. Jackson self-injected in the leg, it would take a while for the drug to reach the brain and for him to stop breathing, but appellant said he was away for only two minutes and then found Mr. Jackson not breathing. The coroner believed the more reasonable scenario was that appellant administered Propofol

13

to Mr. Jackson from time-to-time on June 25 and, because appellant had no dosage device, he incorrectly estimated the amount of Propofol that he administered to Mr. Jackson.

The coroner also concluded that the other sedatives in Jackson's system – Midazolam and Lorazepam – combined with Propofol could result in a quicker and enhanced respiratory depression and cardiovascular failure.

### Appellant's Arrest and Charges and Pre-Trial Proceedings

Appellant was arrested and charged in a one-count information with involuntary manslaughter (Pen. Code, § 192, subd. (b)). Appellant pled not guilty.

Prior to trial appellant sought to have various items that police and the coroner had collected during the course of the investigation tested, though he never sought to have the 100-milliliter vial of Propofol found inside the slit saline bag (People's Exhibit 30) tested to determine the exact chemical content of the residue in the bottle.

Appellant also filed a motion to exclude cameras from the courtroom and to sequester the jury.[11]

Prior to trial, the prosecution filed a motion to exclude evidence of Mr. Jackson's financial condition, lawsuits pending against him and his contract with AEG. The court excluded the evidence concluding that the evidence was irrelevant and inadmissible under Evidence Code section 352. The prosecution also filed a motion *in limine* to exclude, among the testimony of various witnesses, the testimony of Mr. Jackson's dermatologist, Dr. Arnold Klein (and two of Klein's staff members). The prosecutor noted that he would not be objecting to the admission of Dr. Klein's medical records that showed that Dr. Klein had been administering Demerol to Mr. Jackson in the months and weeks before his death. However, the prosecutor also argued that Dr. Klein's testimony (and that of his staff) would not be relevant and might confuse and distract the jury in view of the fact that autopsy results

---

[11] On September 2, 2011, appellant filed a petition for writ of mandate and a stay in this court seeking an order directing the trial court to sequester the jury. This court (case No. B235619) summarily denied the petition, concluding that appellant had not demonstrated the trial court had abused its discretion when it denied his motion.

14

showed Mr. Jackson did not have Demerol in his system at the time of his death. The trial court agreed and excluded the testimony of Dr. Klein and his staff.

### Trial Proceedings

During the trial the prosecution presented testimony from numerous witnesses including Alvarez, the paramedics, UCLA treaters, and coroner investigator Fleak.

To demonstrate that appellant's administration of various drugs, including Propofol, to Mr. Jackson, violated the standard of care in the medical profession the prosecution also presented evidence from medical experts familiar with the proper administration of Propofol and sedatives, treatment of insomnia and the standard of care in the medical profession. Specifically, the prosecution presented three medical experts who opined that appellant committed egregious and unconscionable violations of the standard of care on June 25 and in the months before Mr. Jackson's death when he administered Propofol and other drugs to Mr. Jackson in his home.

Dr. Steven Shafer, anesthesiologist and professor of anesthesiology at Columbia University and an adjunct professor at Stanford University and the University of California, testified during the trial. Dr. Shaffer helped establish the dosing guidelines for Propofol sedation contained in the package insert for the drug. Dr. Shafer also had expertise in the field of Propofol pharmacokinetics and had conducted extensive research in the pharmacokinetics of Propofol, Lorazepam, Midazolam, and Lidocaine. Dr. Shafer reviewed evidence in this case, including the autopsy, toxicology evidence and appellant's statement to police, to evaluate the standard of care provided by appellant. Dr. Shafer observed minor, serious, egregious, and unconscionable violations and deviations from the standard of care.[12]

---

[12] He described the continuum of "violations." A minor violation would not cause harm to a patient; a serious violation could be expected to cause harm to a patient and an egregious violation is one a competent physician would not make and might lead to a foreseeable catastrophic outcome. An unconscionable violation is a violation of a patient's rights.

15

Dr. Shafer identified and testified appellant had made 17 egregious violations, four of which, in his view, were unconscionable.

Dr. Alon Steinberg, a board certified cardiologist, chief of cardiology at Community Memorial Hospital in Ventura, and expert for the California Medical Board (in evaluating whether doctors are within the standard of care in treating patients) also testified during the trial. He reviewed evidence of appellant's acts and omission on June 25, 2009, with a focus on appellant's June 27 statement to the police. Dr. Steinberg found appellant had made six extreme deviations from the standard of care.

Dr. Nader Kamangar was the third expert presented by the prosecution in this case. Dr. Kamanger is a board certified doctor and expert in internal medicine, pulmonary, critical care, and sleep medicine physician. He conducted a review of the treatment provided by appellant to Mr. Jackson and found multiple extreme deviations in the standard of care.

Drs. Shafer and Steinberg found appellant's alleged treatment of insomnia with Propofol was an egregious and extreme deviation from the standard of care. They both testified that at the time of Mr. Jackson's death, there was no precedent that it was appropriate to treat insomnia with Propofol in any setting.

Dr. Kamangar, the expert in sleep medicine, concluded that appellant acted in extreme deviation from the standard of care in his treatment of Mr. Jackson's insomnia. Dr. Kamangar explained, after a diagnosis of insomnia, the physician must first attempt to address the problem through behavioral techniques. But he saw no evidence appellant used such techniques with Mr. Jackson. Dr. Kamangar also explained the physician can use drugs that are approved by the Federal Drug Administration (FDA) to treat insomnia—non-benzodiazepines—and if unsuccessful can use the four FDA approved benzodiazepines in tablet form (Triazolam, Temazepam, Flurazepam, and Prosom). Appellant, however, administered Diazepam, Lorazepam, and Midazolam, benzodiazepines that were not approved by the FDA to treat insomnia. He also opined the intravenous form of these drugs that appellant used was inappropriate for long-term treatment of insomnia. Dr. Kamangar found appellant's administration of Midazolam and Lorazepam intravenously together with Diazepam and Propofol for the treatment of insomnia was an extreme deviation from the

16

standard of care. He explained that Propofol has no role in the management of insomnia and it was "inconceivable" and unethical to use Propofol for that purpose.

The doctors also concluded that appellant committed egregious and extreme violations of the standard of care in numerous ways: (1) failing to obtain informed consent about the risks of long term use of Propofol; (2) failing to have proper medical equipment (emergency airway equipment, suction apparatus, infusion pump to monitor dosing, a proper pulse oximeter with an alarm, a blood pressure cuff, an electrocardiogram, capnography machine, and emergency drugs) at the location where Propofol was administered; (3) failing to have proper medical personnel present to assist him and monitor Mr. Jackson's condition; (4) failing to continuously monitor Mr. Jackson's condition during treatment and leaving him unmonitored for any period of time; (5) failing to document Mr. Jackson's condition during sedation; (6) lacking appropriate skills to respond to an emergency situation and rendering improper aid during the emergency; (7) failing to immediately summon help by calling (8) failing to provide complete information and providing misinformation to medical personnel; (9) failing to keep medical records during the prior months of treatment; and (10) abandoning his independent medical judgment by allowing Mr. Jackson's position as his "employer" to dictate the course of treatment. Dr. Shafer testified that appellant's 17 egregious violations of the standard of care were likely to result in injury or death to Mr. Jackson. The prosecution's experts further opined Mr. Jackson's death was a foreseeable risk and appellant's conduct was not only a substantial factor but also a direct cause of Mr. Jackson's death.

Through the use of simulations and models, Dr. Shafer concluded that appellant administered higher doses of both Lorazepam[13] and Propofol to Mr. Jackson on June 25 than he admitted to police. His opinion was based on the toxicology and autopsy results showing

---

[13] Dr. Shafer's opinion that appellant administered more than the 4 milligrams of Lorazepam he claimed was also based on the fact that appellant's administration of Flumazenil (an antidote to reverse an overdose of Lorazepam) indicated appellant knew he had given Mr. Jackson more than 4 milligrams of Lorazepam. Dr. Shafer testified that 4 milligrams of Lorazepam given hours before appellant claimed would probably not warrant the administration of Flumazenil.

the levels of these drugs present in Mr. Jackson's body at the time of his death. Dr. Shafer's experiments also challenged the claims appellant made as to the time he administered the drugs to Mr. Jackson and the method of administration.[14]

With respect to the administration of Propofol, based on various simulations using different doses of Propofol and comparing those results to the autopsy and toxicology evidence, Dr. Shafer opined that the only scenario consistent with the evidence, was that appellant administered a 100-milliliter infusion of Propofol by drip to Mr. Jackson on June 25.[15] He testified that not only was the 100 milliliter infusion method consistent with the autopsy and toxicology results, it was also consistent with the amount of Propofol appellant had available—specifically the fact appellant purchased 130 vials of 100 milliliter of Propofol—enough vials to use a 100-milliliter vial every night. It further corresponded with the evidence found in Mr. Jackson's room by Alvarez and collected by coroner investigator Fleak, including Exhibit 30, the saline slit bag with the 100-milliliter bottle of Propofol inside. The scenario was consistent with appellant having left Mr. Jackson alone in the room for a period of time unmonitored because he appeared to be alright.

---

[14] Dr. Shafer explained that Mr. Jackson's stomach contents and other evidence showed that Mr. Jackson did not orally ingest Propofol or swallow Lorazepam pills between 8:00 a.m. and 12:00 noon, contrary to appellant's theory of causation.

[15] Under this scenario, appellant would start the infusion, by drip at about 9:00 a.m., and it would run until about 12:00 noon. Shafer explained that during the infusion, there would be an accumulation of Propofol in the body. Initially, the level of Propofol would rise quickly to a concentration that was high enough that the amount of drug that the liver was metabolizing would be about the same as the amount running into the patient. Thereafter the Propofol would begin to fill up in the organs. Between 9:00 a.m. and 10:00 a.m., he estimated that Mr. Jackson's breathing would have slowed and from 11:00 to 11:45 a.m., Mr. Jackson's breathing would have slowed to the point of apnea. Around 11:30 or 11:45 a.m., the flow of oxygen into Mr. Jackson's lungs would stop and about 10 to 15 minutes later, Mr. Jackson's heart would stop. Mr. Jackson would have died with the infusion running. As a result, the level of Propofol in the blood would be high, because there would be no opportunity for the rapid metabolism of Propofol.

18

Dr. Shafer also demonstrated how a Propofol infusion could be administered using a saline slit bag and with a bottle of Propofol inside such as that recovered in this case (Exhibit 30).[16]

The medical experts also testified about other issues related to the cause of Mr. Jackson's death. Dr. Shafer and Dr. Kamangar testified that appellant's administration of multiple, simultaneous drugs (Diazepam, Midazolam, Lorazepam, and Propofol) that day, which they labeled engaging in "poly pharmacy," was not only a serious violation of the standard of care, but also a possible cause of Mr. Jackson's death. They testified that administering these drugs, even in the doses appellant admitted in his statement to police, coupled with Mr. Jackson's dehydration and the lack of other medical safeguards created a risk of respiratory depression and cardiovascular failure and culminated in the "perfect storm" which appeared to occur in this case.

The prosecution's experts concluded, even based on appellant's version of events, that Mr. Jackson ingested Lorazepam and/or Propofol when appellant left him unmonitored, appellant was still directly responsible for Mr. Jackson's death based on the egregious violations of the standard of care—including, failing to monitor, failing to have the basic equipment, abandoning his patient, allowing access to drugs, lying to medical personnel, and delaying in calling 9-1-1. Dr. Shafer explained it would have been a foreseeable consequence of setting up a dangerous manner of administering drugs and then abandoning Mr. Jackson. Also, if appellant's statement that Mr. Jackson liked to "push" Propofol were true, it was an entirely foreseeable risk that Mr. Jackson could self-inject. Dr. Steinberg explained that

---

[16]     Dr. Shafer observed the stopper of Exhibit 30 (the 100-milliliter Propofol bottle found in the slit saline bag) had been penetrated with a spike. Dr. Shafer conceded that he had not before seen a slit saline bag used to suspend a Propofol bottle as was used in this case and that is was an extremely unsafe and unstable setup which made it difficult to control the dose received. However, he also related, there was no difference in "the plumbing" when a Propofol bottle is suspended on its own or inside a saline bag. Because of the use of this infusion setup, the long tubing found on the IV stand inside Mr. Jackson's bedroom did not test positive for Propofol, but the short tubing following the Y-connector did.

hospitals store sedatives in locked, password-protected cabinets because it is foreseeable that someone could take medicine inappropriately.

During his defense case, appellant presented character witnesses, including testimony from former patients who stated that appellant would not abandon a patient, was a caring doctor, and was not motivated by money.

Appellant presented evidence that Mr. Jackson attempted to obtain intravenous sleep medication, including Propofol from other doctors and other health care professionals in the past. He presented evidence that Mr. Jackson was apprised that it was not appropriate to use Propofol in a home setting and that it was an anesthetic used for surgery or in the ICU. He presented evidence that Mr. Jackson stated that he had been told that it could be administered at home if he was monitored.

Appellant also presented evidence from an expert Dr. Robert Waldman who specializes in internal medicine, nephrology, and addiction medicine. Dr. Waldman testified that based on the description of Mr. Jackson's conduct and condition in the days leading up to his death and Dr. Klein's records, it appeared that Mr. Jackson may have been dependent and possibly addicted to Demerol. He opined that Mr. Jackson appeared to be exhibiting symptoms of withdrawal from Demerol, which include: sweating; increased heart rate; muscular and bone aches and pains; severe anxiety; insomnia; and hot and cold chills.

Dr. Paul White, a retired anesthesiologist who had studied and published papers on the effects of Propofol on the body also testified. Dr. White presented evidence to support appellant's theory of the case that Mr. Jackson caused his own death by self-administering doses of Lorazepam by pill and then injecting himself with a fatal dose of Propofol. Dr. White further opined that appellant's treatment of Mr. Jackson on June 25, namely, that he gave Mr. Jackson a 25-milligram injection of Propofol (over three to five minutes) and then left the room would not present a dangerous situation.

Dr. White rejected Dr. Shafer's theory that appellant administered 100 milliliters of Propofol as inconsistent with appellant's statement to police and the physical evidence, including the amount of Propofol found in the autopsy urine and the Lidocaine levels at

20

autopsy. Dr. White stated that he had never seen or heard of a slit saline bag used to hang a bottle of Propofol.

In describing his view that Mr. Jackson injected himself with the lethal dose of Propofol, Dr. White theorized that appellant drew up a syringe of Propofol and Lidocaine and then left Mr. Jackson and the syringe of Propofol in the room unattended for some period time. Dr. White believed Mr. Jackson injected himself after 11:40 a.m., when appellant was on the 30-40 minute telephone call. Dr. White assumed that the following series of events occurred: Mr. Jackson got out of bed, wheeled the I V stand while holding the urine bag (which he was attached by the condom catheter), got the syringe of Propofol somewhere in the room, returned to bed and then he self-administered the fatal dose of 25 milligrams of Propofol at the Y-connector. Dr. White opined that Mr. Jackson would have died instantly upon self-injection.

Dr. White conceded appellant deviated from the standard of care in his treatment of Mr. Jackson on June 25 and during the prior two months. Dr. White agreed that continuous observation of a patient who is sedated by Propofol was warranted, but he also explained that, if a patient is observed for 20 to 30 minutes after a single slow dose of 25 milligrams of Propofol, it is safe for the physician to leave the patient's bedside. Dr. White could not justify appellant failing to call 9-1-1 for 20 minutes but explained that, if a patient is already dead, it is unlikely anything can be done by help arriving five minutes later. Dr. White believed appellant overlooked mentioning Propofol to the paramedics, but even if he had mentioned it, the outcome would have been the same.

In rebuttal, the prosecution presented additional testimony from Dr. Shafer who explained that his simulations were consistent with the levels of Propofol, Lorazepam and Lidocaine in Mr. Jackson's body at the time of his death and that his infusion theory was not dependent on Mr. Jackson dying at a particular time (i.e., noon). He explained that the purpose of the simulation was to show that he could have died at any time when the drug concentration was high in his blood. Dr. Safer related that it was possible for appellant to remove some Propofol from the glass vial and replace it with Lidocaine, which would

21

account for the level of Propofol and Lidocaine in Mr. Jackson's body at the time of his death.

A jury found appellant guilty as charged.

**Post Verdict and Sentencing**

The trial court denied probation and sentenced appellant to the high term of four years, to be served in county jail under the Realignment Act and the provisions of Penal Code section 1170, subdivision (h). The court awarded appellant credit for 46 days in presentence custody, consisting of 23 days of actual custody and 23 days of good time/work time credit.

Appellant filed this appeal.

*DISCUSSION*

**I. Substantial Evidence Supports Appellant's Involuntary Manslaughter Conviction**

Appellant contends sufficient evidence did not support his involuntary manslaughter conviction and that his conviction was obtained in violation of his federal constitutional rights. We disagree.

**A.      Relevant Legal Principles**

**1.      Sufficiency of the Evidence**

A criminal conviction not supported by sufficient evidence violates both state and federal due process and is thus invalid. (U .S. Const., amend. XIV, § 1; Cal. Const., art. I, § 15; *People v. Rowland* (1992) 4 Cal.4th 238, 269.) "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) We must presume the existence of every fact that the trier of fact could reasonably deduce from the evidence.[17] (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1322.)

---

[17]      "Evidence that merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence; it merely raises a

The sufficient evidence standard is the same whether the evidence is direct or circumstantial. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 200; *People v. Pierce* (1979) 24 Cal.3d 199, 210 ["Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt"].) Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. (*People v. Millwee* (1998) 18 Cal.4th 96, 132.) "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' [Citations.]" (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.)

We may reverse for lack of substantial evidence only if "upon no hypothesis whatever is there sufficient substantial evidence to support" the conviction. (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1508.) Finally, if the verdict is supported by substantial evidence, we accord due deference to the verdict and will not substitute our evaluations of the witnesses' credibility for that of the trier of fact. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196.)

### 2.	Involuntary Manslaughter

"Involuntary manslaughter is a lesser offense of murder, distinguished by its mens rea. [Citation.] The mens rea for murder is specific intent to kill or conscious disregard for life. [Citation.] Absent these states of mind, the defendant may incur homicide culpability for involuntary manslaughter. [Citations.] Through statutory definition and judicial development, there are three types of acts that can underlie commission of involuntary manslaughter: a misdemeanor, a lawful act, or a noninherently dangerous

possibility, and this is not a sufficient basis for an inference of fact." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

23

felony. [Citation.] [F]or all three types of predicate acts the required mens rea is criminal negligence." (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006.)

Criminal negligence exists when the defendant engages in "aggravated, culpable, gross, or reckless" conduct, that is such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or in other words, a disregard of human life or an indifference to consequences. (*People v. Butler, supra,* 187 Cal.App.4th at p. 1008.) Criminal negligence has also been described as existing "'when a man of ordinary prudence would foresee that the act would cause a high degree of risk of death or great bodily harm.'" (*Ibid.*)

In addition,"[i]mplied malice murder requires a defendant's conscious disregard for life, meaning that the defendant subjectively appreciated the risk involved. [Citation.] In contrast, involuntary manslaughter merely requires a showing that a reasonable person would have been aware of the risk. [Citation.] Thus, even if the defendant had a subjective, good faith belief that his or her actions posed no risk, involuntary manslaughter culpability based on criminal negligence is warranted if the defendant's belief was objectively unreasonable. [Citations.]." (*People v. Butler, supra*, 187 Cal.App.4th at pp. 1008-1009, fn. omitted.) "The act must be one which has knowable and apparent potentialities for resulting in death. Mere inattention or mistake in judgment resulting even in death of another is not criminal unless the quality of the act makes it so. The fundamental requirement fixing criminal responsibility is knowledge, actual or imputed, that the act of the accused tended to endanger life. [Citation.]" (*People v. Rodriguez* (1960) 186 Cal.App.2d 433, 440.)

Involuntary manslaughter, like other forms of homicide, also requires a showing that the defendant's conduct proximately caused the victim's death. (*People v. Sanchez* (2001) 26 Cal.4th 834, 845; *People v. Brady* (2005) 129 Cal.App.4th 1314, 1324.) The jury need not decide whether the defendant's conduct was the primary cause of death, but need only decide whether the defendant's conduct was a substantial factor in causing the death.

24

Furthermore, when there are concurrent causes of death, the defendant is criminally responsible if his or her conduct was a substantial factor contributing to the result. When the conduct of two or more persons contributes concurrently as the proximate cause of the death, the conduct of each is a proximate cause of the death if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the time of the death and acted with another cause to produce the death. (*People v. Butler, supra*, 187 Cal.App.4th at p. 1009.) Likewise, "intervening causes" do not relieve a defendant of criminal liability unless the intervening cause is an unforeseeable and extraordinary and abnormal occurrence which rises to the level of an "exonerating, superseding cause." (*People v. Crew* (2003) 31 Cal.4th 822, 847.) "The defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act." (*Ibid.*)

Thus, "proximate causation requires that the death was a reasonably foreseeable, natural and probable consequence of the defendant's act, rather than a remote consequence that is so insignificant or theoretical that it cannot properly be regarded as a substantial factor in bringing about the death. [Citation.]" (*People v. Butler, supra*, 187 Cal.App.4th at pp. 1009-1010; *People v. Catlin* (2001) 26 Cal.4th 81, 155.) Whether the defendant's conduct was a proximate, rather than remote, cause of death is ordinarily a factual question for the jury unless "'undisputed evidence . . . reveal[s] a cause so remote that . . . no rational trier of fact could find the needed nexus.'" (*People v. Brady, supra,* 129 Cal.App.4th at p. 1326.)

A jury's finding of proximate causation will be not disturbed on appeal if there is 'evidence from which it may be reasonably inferred that [the defendant's] act was a substantial factor in producing' the death. (*People v. Scola* (1976) 56 Cal.App.3d 723, 726 [128 Cal.Rptr. 477].)" (*People v. Butler, supra,* 187 Cal.App.4th at p. 1009.) With these legal principles in mind we turn to appellant's claims.

### B. Appellant's Contentions

At trial, the prosecution presented two theories of involuntary manslaughter: (1) appellant committed an act – administered the lethal dose of Propofol – with criminal negligence that caused Mr. Jackson's death; and (2) appellant failed to perform his legal duty as a physician, and acted with criminal negligence, and indirectly caused Mr. Jackson's death. Before this court, appellant claims that the evidence presented at trial supported neither prosecution theory and instead supported his version of events that Mr. Jackson caused his own death by self-administering the lethal dose of Propofol and that nothing appellant did either before or afterwards was a substantial cause of Mr. Jackson's demise. As we shall explain, in our view sufficient evidence supports the prosecution's theories of causation; and substantial evidence supports a finding of appellant's criminal negligence even under appellant's self-administration theory because Mr. Jackson's conduct would have been foreseeable.

### 1. Appellant Failed to Perform His Legal Duty as a Doctor

Preliminarily, we observe that both prosecution theories of liability center on the issue of causation. Relevant to these theories is the issue of duty, and specifically whether appellant breached a duty to Mr. Jackson because his conduct fell below the appropriate standard. The record discloses overwhelming evidence that appellant breached his duty to Mr. Jackson in numerous serious and egregious ways, including treating Mr. Jackson with drugs not designed to address symptoms of insomnia; administering Propofol outside a hospital setting without proper equipment and personnel present to monitor Mr. Jackson's condition; failing to continually monitor Mr. Jackson on June 25; failing to be prepared for an emergency or call 9-1-1 immediately; withholding information from first responders and the hospital personnel and in failing to keep records. Even appellant's expert, Dr. White conceded that appellant's conduct fell below the standard of care.

Although appellant presented some evidence and arguments to the contrary, at most those matters presented a conflict in the evidence. Such conflicts are resolved by the jury, not this court. We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

26

### 2. Appellant Caused Mr. Jackson's Death When He Administered Propofol on June 25

The evidence presented at trial showed that Mr. Jackson died as a result of acute Propofol intoxication with the contributing effect of benzodiazepines. The prosecutor argued that appellant caused Mr. Jackson's death by administering a Propofol infusion to Mr. Jackson on June 25. The evidence presented at trial presented several scenarios for the administration of Propofol that day. The prosecutor theorized that appellant placed Mr. Jackson on a Propofol drip using a 100 milliliter bottle of Propofol suspended inside a saline bag and then left Mr. Jackson unmonitored (the "Infusion Theory"). Appellant admitted to police that he administered 25 milligrams of Propofol (the 25 Milligram Theory"). In our view, substantial evidence in the record supports appellant's conviction under either theory.

#### a. The Infusion Theory

Substantial evidence presented at trial supports the Infusion Theory of causation. Specifically, evidence found in Mr. Jackson's bedroom demonstrated the use of this infusion method. Alvarez testified that before calling 9-1-1, appellant instructed him to remove one of the two saline bags hanging from the IV stand next to Mr. Jackson's bed and put it inside the blue bag. Alvarez stated that he saw a bottle resembling a Propofol bottle (Exhibit 30) inside of the saline bag (Exhibit 29) with the stopper of the bottle pointing towards the port of the bag, and that Alvarez saw a milky white residue inside the saline bag consistent with the appearance of Propofol. Coroner's investigator Fleak also testified that from a bag in Mr. Jackson's closet she retrieved the saline slit bag with a 100 milliliter Propofol bottle inside. Appellant's fingerprint was also found on the Propofol bottle.

Appellant's challenge to the evidence presented by these witnesses is unavailing. Appellant points out that Alvarez did not immediately report to authorities that he found the Propofol bottle inside the saline bag and that Fleak did not explain that she found the bottle inside the saline bag until the preliminary hearing. However, these circumstances do not render their testimony physically impossible, inherently improbable or otherwise

legally insufficient. Instead these matters about which appellant complains on appeal relate to the credibility of these witnesses. The assessment of the believability of Alvarez's and Fleak's testimony and the weight to attribute to their evidence are the exclusive province of the jury. Here the jurors heard the attacks on Alvarez's and Fleak's credibility, had the opportunity to observe the witnesses in person and were properly instructed on how to assess witness credibility. Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment. It is the province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.

The Infusion Theory was also supported by the evidence of the drugs appellant had purchased from the pharmacy in Las Vegas in the months and weeks prior to Mr. Jackson's death. It was consistent with how appellant had previously administered the drug to him – that appellant was giving appellant nightly infusions of Propofol from 100 milliliter bottles, using slit saline bags and vented tubing. Although this was an unconventional and unstable setup for an infusion, even appellant's expert witness conceded that it could work as a method to infuse the Propofol.[18]

The Infusion Theory is further consistent with the amount of Propofol,[19] Lorazepam and Lidocaine found in Mr. Jackson's body at his autopsy and other

---

[18]    Moreover, that there was no second set of tubes for the infusion found at the scene is not fatal to the theory as the prosecutor presented evidence that the tubing was small and could fit into the palm of one's hand and could have easily been removed and disposed of by appellant.

[19]    Appellant argues that the low levels of Propofol in Mr. Jackson's post-mortem vitreous fluid (i.e., the fluid behind his eyeball) undermines the Infusion Theory. Appellant maintains that the amount of Propofol found in Mr. Jackson's brain – which he argued can be inferred from the amount in his vitreous fluid – was below the risk of apnea for even the most sensitive patients – proving he could not have died from respiratory arrest as posited under the Infusion Theory. Instead, appellant asserts that these levels of Propofol coupled with death prove Mr. Jackson died quickly from cardiac arrest, consistent with his theory of self-administration of Propofol. Appellant's argument about the vitreous fluid is unconvincing. As the Attorney General points out there was not enough vitreous fluid available to conduct a full analysis of it, and the fluid

28

toxicology results. As Dr. Safer related that it was possible for appellant to remove some Propofol from the glass vial and replace it with Lidocaine, which would account for the level of Propofol and Lidocaine in Mr. Jackson's body at the time of his death. Dr. Shafer further explained that appellant could have died with the infusion running. He pointed out that once Mr. Jackson stopped breathing, 10-15 minutes later his heart stopped. The level of Propofol in his blood would be high at this point because his body would have stopped metabolizing the Propofol.

Furthermore, the prosecution's Infusion Theory is supported by evidence of appellant's conduct on June 25. The amount of time appellant spent handling matters unrelated to his care of Mr. Jackson—talking on his cellphone, sending texts and e-mails – that morning also support this theory of causation. The Infusion Theory is consistent with appellant's statement to police. Appellant told police that Mr. Jackson required him to clean up the room immediately after treatments and did not want things lying around. Given this practice, that the 100 milliliter bottle and slit saline bag were present in the room on June 25 when Jackson died, implies that those items had been used that day and not on some prior occasion.

Appellant's acts also show a consciousness of guilt. (*People v. Holloway* (2004) 33 Cal.4th 96, 142 ["The inference of consciousness of guilt from willful falsehood or fabrication or suppression of evidence is one supported by common sense"].) Appellant did not maintain proper medical records for Mr. Jackson. Appellant made false and misleading statements to first responders and medical providers at the UCLA hospital. He told them that Mr. Jackson had only been down for about one minute and that he did not disclose all of the medications that he had given Mr. Jackson that day and he misrepresented what he had observed. His efforts to clean-up the scene also show guilt.

_____

was diluted for testing. In addition, there was no evidence presented during the trial that the amount of Propofol found in the vitreous fluid would correspond to that found in the brain.

29

Appellant also made a number of misleading statements to the police during his interview on June 27 about his actions both before and after June 25.

In sum, sufficient evidence – the physical evidence and expert testimony – supported the prosecution's Infusion Theory of causation.

### b.        The 25 Milligram Theory

Notwithstanding the Infusion Theory, sufficient evidence presented at the trial also would support appellant's conviction based on his admission of administering 25 milligrams of Propofol on June 25 in conjunction with other drugs.  First, the prosecution's medical experts testified that Propofol should not under any circumstances have been administered to Mr. Jackson to treat insomnia, and should not have been used in a home setting.  They testified that appellant had none of the safeguards or medical equipment in place to ensure against the risk inherent in the administration of a general anesthetic.  Second the autopsy evidence and toxicology results show that appellant administered other sedatives that morning, engaging in "poly pharmacy."  Appellant admitted to police that he gave Mr. Jackson doses of Diazepam, multiple injections of Lorazepam and Midazolam.  According to the evidence presented at trial, none of these drugs should have been administered to treat insomnia.  Experts testified that even 25 milligrams of Propofol in conjunction with the other drugs given put Mr. Jackson at risk of serious injury or death.  It was described that appellant created a "perfect storm" resulting in appellant's death.  Thus, even based on the drugs appellant admitted administering to Jackson, a jury could conclude that appellant's conduct was a substantial factor in Mr. Jackson's death.

Appellant attempted to counter the prosecution's evidence on this point through the testimony of Dr. White who offered his view that appellant's admitted conduct— administering 25 milligrams of Propofol over a three to five minute period and then leaving the room, would not present a dangerous situation.  The resolution of the conflict in this expert testimony, as with other conflicts in the testimony, is committed to the sound judgment of the jury.  Appellant has presented no sound argument—no convincing

attack on the evidence presented by the prosecutor on this issue that would cause this court to second guess the jury's conclusion.

### 3. Appellant's Conduct That Fell Below the Standard of Care Caused Mr. Jackson's Death

In addition to administering Propofol and other drugs, the prosecution theorized that appellant's breaches of the standard of care were a substantial factor in Mr. Jackson's death. Evidence presented at trial showed that appellant's conduct of using the various drugs outside of a hospital setting without the proper monitoring and safeguards, and engaging in other activities (texting, e-mails, phone calls) while attending to Mr. Jackson contributed to Mr. Jackson's death. Because appellant was distracted or had left the room he failed to realize that Mr. Jackson had stopped breathing. Dr. Shafer also testified that appellant effectively abandoned Mr. Jackson. Dr. Shafer testified that Jackson's death was an expected consequence of not being monitored—that is, it was a substantial factor in his death.

Although appellant offered the opinions of Dr. White and Dr. Waldman in an effort to counter the prosecution's evidence on these points, the jury resolved any conflict among the experts' views in favor of a verdict of guilt. Appellant has not made any convincing argument to this court to undermine the jury's determination.

### 4. Evidence Presented at Trial Does Not Support Appellant's Self-Administration Theory, and Even Assuming it Did, Mr. Jackson's Conduct Would Not Constitute An Independent Intervening Cause

At trial appellant offered an alternative theory of causation, namely, that Mr. Jackson caused his own death by self-administering the lethal dose of Propofol and that nothing appellant did either before or afterwards was a substantial cause of Mr. Jackson's death (the "Self-Administration Theory").

Appellant's "Self-Administration Theory" is not supported by the evidence presented at trial. In our view it is based almost entirely on conjecture and speculation that does not undermine the jury's verdict.

31

In describing his view that Mr. Jackson injected himself with the lethal dose of Propofol, appellant's expert Dr. White theorized that appellant drew up a syringe of Propofol and Lidocaine and then left Mr. Jackson and the syringe of Propofol in the room unattended for some period of time.[20] Dr. White suggested that Mr. Jackson injected himself when appellant was on a telephone call. Dr. White assumed that the following series of events occurred: Mr. Jackson got out of bed, wheeled the IV stand, while holding the urine bag, got the syringe of Propofol somewhere in the room, returned to bed and then self-administered the fatal dose of 25 milligrams of Propofol at the Y-connector. Dr. White opined that Mr. Jackson would have died instantly upon self-injection.

Given Mr. Jackson's general condition, and level of sedation, and the fact that it did not appear even by appellant's account that Mr. Jackson had moved from the bed, this version of events strains credulity.

In any event, even if Mr. Jackson self-administered as appellant claimed, Mr. Jackson's conduct would have been foreseeable and would not have been an exonerating, superseding cause. Although appellant stated that he would not allow Mr. Jackson to self-inject with Propofol, he was aware that Mr. Jackson liked to inject himself and had been allowed to "push" Propofol before. Appellant knew that Mr. Jackson was desperate for sleep that morning and that Mr. Jackson felt that Propofol was the only effective drug to induce sleep. Appellant admitted he left the room for a few minutes, giving Mr. Jackson access to all of these medications. In view of these facts, appellant should have foreseen the possibility of harm of the kind that could result from his act. Thus, even under the "Self-Administration Theory" of causation, the jury could find appellant criminally liable for Mr. Jackson's death.

---

[20]     Before this court, appellant suggests that perhaps Mr. Jackson had a secondary source, other than appellant, for the Propofol. This suggestion is speculation and finds no support in the record.

## II. Appellant Has Failed to Demonstrate Reversible Error With Respect To Exhibit 30 The 100 Milliliter Propofol Bottle

Before this court, appellant asserts several errors with respect to Exhibit 30—the 100 milliliter Propofol bottle that Alvarez testified was inside the saline slit bag (Exhibit 29) that appellant ask Alvarez to remove from the IV stand next to Mr. Jackson's bed while appellant was attempting to resuscitate Mr. Jackson on June 25. First, appellant claims that the trial court erred in failing to grant his post-trial motion to test the residue inside of Exhibit 30. Second he claims that his counsel was ineffective for failing to seek testing of the 100 milliliter bottle during the trial, and in failing to thoroughly question Dr. Shafer about the aspect of the Infusion Theory which assumed that Lidocaine could be added to the 100 milliliter bottle. We address these contentions in turn.

### A. Factual Background

The autopsy and toxicology evidence showed high levels of Lidocaine in Mr. Jackson's body at the time of his death. During the trial, appellant's expert Dr. White testified that the prosecution's Infusion Theory was incompatible with the amount of Lidocaine found in Mr. Jackson's body during the autopsy. In testifying on this point Dr. White noted that Lidocaine, a local anesthetic, is used in conjunction with Propofol because it relieves the burning sensation caused by the initial injection of Propofol. He testified that Lidocaine may be administered either with Propofol or by itself just before the Propofol. In critiquing the prosecution's Infusion Theory, Dr. White testified that Dr. Shafer's model relied upon mixing Lidocaine and Propofol together and that one possible way to do that was to add Lidocaine to the Propofol bottle.[21] Dr. White rejected this method because he did not believe the Propofol bottle could hold more than 100 milliliters of Propofol, so no additional Lidocaine could be added.

---

[21] He further testified that a second method to administered Lidocaine would be to draw up a one-to-one mixture of Lidocaine and inject it before the Propofol infusion began. Dr. White rejected the second method because if the Lidocaine were injected in this manner at 9:00 a.m., as assumed by the Infusion Theory, there would be no Lidocaine remaining in Jackson's body at the time of his death at about noon.

During rebuttal, when he was questioned about the method of mixing Propofol with Lidocaine to achieve the high levels of the drug found in Mr. Jackson's body at the time of his death, Dr. Shafer referred to the report he had prepared for the case which was provided to the defense, and which Dr. White had critiqued. Dr. Shafer explained that his report did in fact suggest that mixing Propofol with Lidocaine in some ratio, either 10 to 1 or one-to-one, could be done. He further testified that the simulations he conducted and described in the report involved Lidocaine and Propofol being administered concurrently and that it was "very simple to simply remove some Propofol from the glass vial and replace it with Lidocaine." Appellant's counsel did not ask Dr. Shafer any follow-up questions about the process of, or possible mechanism to remove the Propofol from the bottle and replace it with Lidocaine. In addition, counsel did not ask Dr. Shafer whether Exhibit 30 had been tested for trace amounts of Lidocaine.

Two weeks after the jury found appellant guilty, appellant filed a two-page motion seeking an order to test the chemical composition of the residue in Exhibit 30. Appellant argued that the chemical composition in Exhibit 30 had become relevant to either confirm or refute the accuracy of Shafer's Infusion Theory, and that if no amount of Lidocaine was found in Exhibit 30 then it would refute the prosecution's Infusion Theory. Appellant's motion did not cite any supporting legal authority nor did it offer to explain why the motion to seek testing had not been brought before the trial ended.

At the hearing on the motion, appellant's counsel argued that testing of Exhibit 30 was necessary to determine the accuracy of the prosecution's Infusion Theory, and that the hypothesis – that Lidocaine could be injected into the 100 milliliter bottle after removing some amount of Propofol – was a new theory that was brought up for the first time during Dr. Shafer's rebuttal. Counsel argued that Exhibit 30 had always been described in the case as an empty bottle, and counsel had not noticed that it contained any residue.

When the court asked appellant's counsel why he had not made the request during the trial, counsel responded that "he didn't think of it" and "hadn't paid too much attention to it." Counsel said that he had not anticipated that the prosecution intended to

34

contend that appellant had replaced Propofol in the 100 milliliter bottle with Lidocaine and he argued that the prosecution should have tested the contents of the bottle. Appellant contended that he was entitled to testing because Dr. Shafer's explanation was a new theory presented for the first time during rebuttal. The court responded that the defense had the information that the bottle contained residue during the trial and yet did not seek an order for testing. Appellant's counsel stated that he did not think the court would have granted the motion had the defense sought the testing, to which the court responded that it had not been asked. Appellant's counsel also stated that a day or two after Shafer testified on rebuttal (and before the trial had ended), Dr. White informed counsel that he thought the bottle contained residue and that it should be tested. Counsel also conceded that he had not understood the issue at the time Dr. White made that suggestion.

The prosecutor responded that whether or not the Exhibit 30 contained Lidocaine was irrelevant, pointing out that other than appellant "no one knows exactly what happened in that room that night. It could be that Dr. Murray used the Y-port and the syringe and injected a great deal of Lidocaine in an effort to resuscitate Mr. Jackson after he found him dead."

The court denied the motion, finding that there was no justification for "this type of extraordinary motion. The court specifically observed that "People's 30 had been and has been characterized as an exhibit containing a clear plastic bag containing one 100 milliliter Propofol bottle with small amount of liquid." The court stated that Exhibit 30 had been available since the inception of the case and observed that the defense in fact had sought testing of other evidence in the case.

### B. The Post-Verdict Motion to Test Exhibit 30

Appellant argues that the trial court abused its discretion when it denied the motion to test Exhibit 30 because the chemical composition of the residue did not become relevant until the rebuttal phase of the case and the results of the testing would potentially constitute newly discovered exculpatory evidence. Appellant further asserts that the court's order violated his constitutional right to due process and a fair trial because it

35

denied him access to evidence which would have supported a new trial motion based on newly discovered evidence. As we shall explain, appellant has not established error under state or federal law.

Due process requires that a defendant in a criminal case have the opportunity to examine and in appropriate cases have tests performed on evidence to be offered against them. (*People v. Backus* (1979) 23 Cal.3d 360, 384.) Indeed under both state and federal law the prosecution has a duty to disclose material evidence favorable to the accused, even if the defense made no request concerning the evidence. (Pen. Code, § 1054, et seq.; *Brady v. Maryland* (1963) 373 U.S. 83;[22] *United States v. Agurs* (1976) 427 U.S. 97, 107.) The duty encompasses impeachment evidence as well as exculpatory evidence. (*United States v. Bagley* (1985) 473 U.S. 667, 676.) There is, however, no improper suppression of evidence, where the appellant had access to the evidence or it was available during trial and the only reason for not presenting it was his lack of diligence. (*People v. Morrison* (2004) 34 Cal.4th 698, 715; *People v. DePriest* (2008) 42 Cal.4th 1, 38-39 [court did not err in failing to grant a continuance to conduct an additional investigation of evidence where appellant had an opportunity to investigate and defend against the evidence during the trial].)

Under the circumstances presented here, we conclude the court did not err in denying appellant's motion. Appellant has no legal authority to support his argument that the court was obliged to grant his post-trial request for the testing of Exhibit 30, nor has our research found any. Although appellant does not argue a *Brady* error per se, appellant relies on the general principles in *Brady* regarding the prosecutor's disclosure obligations to support his argument that he should have been allowed to test Exhibit 30 to

---

[22]    To merit relief on *Brady* grounds, "the evidence a prosecutor failed to disclose must have been both favorable to the defendant and material on either guilt or punishment. Evidence would have been favorable if it would have helped the defendant or hurt the prosecution, as by impeaching one of its witnesses. Evidence would have been material only if there is a reasonable probability that, had it been disclosed to the defense, the result would have been different." (*People v. Dickey* (2005) 35 Cal.4th 884, 907.)

challenge the prosecutor's new theory and that the results of the testing would potentially constitute newly discovered exculpatory evidence to support a new trial motion.

There are a number of problems with appellant's arguments. First, there is no legal requirement under *Brady* or under California law that the prosecution must disclose its *theories* to the defense. In any event, the record does not support appellant's argument that the prosecution presented a "new theory" during the rebuttal that Lidocaine was added to Exhibit 30. Dr. Shafer's original report presented the idea that Lidocaine could be mixed with the Propofol which would have justified a request to test Exhibit 30. Furthermore, it was appellant's own expert, Dr. White, who suggested the idea of placing Lidocaine in the Propofol bottle. Accordingly appellant cannot claim that he was surprised by a new theory. Second, a number of witnesses testified that Exhibit 30 appeared to contain residue, and thus this is not newly discovered evidence.[23]

To be sure, although the prosecution may not withhold favorable and material evidence from the defense, neither does it have the duty to conduct the defendant's investigation for him. (*People v. Morrison, supra,* 34 Cal.4th at p. 715.) If the material evidence is in a defendant's possession or is available to a defendant through the exercise of due diligence, then, at least as far as evidence is concerned, the defendant has all that is necessary to ensure a fair trial, even if the prosecution is not the source of the evidence. (*Coe v. Bell* (6th Cir.1998) 161 F.3d 320, 344; *United States v. Pandozzi* (1st Cir.1989)

---

[23]   In this respect it would not have supported a new trial motion based on newly discovered evidence even had the court allowed the testing. Under Penal Code section 1181, a trial court can grant a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (Pen. Code § 1181, subd. (8).) "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: '"1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits."' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)

878 F.2d 1526, 1529–1530.)  Accordingly, "when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim." (*United States v. Brown* (5th Cir.1980) 628 F.2d 471, 473; see also *United States v. Stuart* (8th Cir.1998) 150 F.3d 935, 937 [Evidence is not suppressed if the defendant has access to the evidence prior to trial by the exercise of reasonable diligence]; *United States v. Slocum* (11th Cir.1983) 708 F.2d 587, 599 [newly-discovered evidence does not warrant a new trial unless, inter alia, the evidence is discovered following trial and the movant demonstrates due diligence to discover the evidence prior to trial].)

Appellant could have filed a motion for testing of the contents of Exhibit 30 during rebuttal or afterwards before the trial ended.  His only justification for waiting until 11 days after the verdict to seek testing was that he failed to appreciate the significance of the evidence until after the trial ended.  Appellant did not demonstrate diligence in regard to this evidence.  Under these circumstances we conclude that the trial court did not err in denying appellant's post-trial request to test the contents of Exhibit 30.

## C.    Ineffective Assistance of Counsel Claim

Appellant offers an alternative argument with respect to Exhibit 30.  Specifically he claims his counsel was ineffective in failing to timely seek testing of the 100 milliliter bottle during the trial, and in failing to thoroughly question Dr. Shafer about that aspect of the Infusion Theory which assumed that Lidocaine could be added to the 100 milliliter bottle.  As we shall explain, appellant has failed to demonstrate that he suffered prejudice as a result of his counsel's representation.

A conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes both of the following: (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. (*People v. Huggins* (2006) 38 Cal.4th 175, 205-206; *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694.)

Prejudice must be affirmatively proved. The defendant has the burden of proving ineffective assistance of counsel by a preponderance of the evidence. (*People v. Mincey* (1992) 2 Cal.4th 408, 449.) "'It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . . The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Ledesma* (1987) 43 Cal.3d 171, 217–218.) If the defendant fails to make a sufficient showing either of deficient performance or prejudice, the ineffective assistance claim fails. (*People v. Foster*, *supra*, 111 Cal.App.4th at p. 383.) This second "prejudice" prong is not solely one of outcome determination. Instead, the question is whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. (*In re Harris* (1993) 5 Cal.4th 813, 833.)

A court should proceed directly to the issue of prejudice if it is easier to dispose of an ineffectiveness claim on that basis. (*Stricklan*d, *supra*, 466 U.S. at p. 697; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1241; *People v. Holt* (1997) 15 Cal.4th 619, 703; *In re Fields* (1990) 51 Cal.3d 1063, 1079.)

Here, appellant complains that his trial counsel not only failed to seek testing of the residue in Exhibit 30, but also failed to ask Dr. Shafer if Exhibit 30 had been tested for Lidocaine and did not ask other follow-up questions about the mechanism for removing and replacing Propofol with Lidocaine. Appellant asserts that there is no valid reason for his counsel's failings pertaining to Exhibit 30. Appellant contends if Dr. Shafer had properly been cross-examined appellant may have been able to show that the residue in the 100 milliliter bottle was not tested and that Dr. Shafer's theory was based on speculation, and as a result "appellant might have been acquitted."

In our view, appellant has failed to demonstrate prejudice. If appellant had timely sought to test Exhibit 30 and/or asked more probing questions of Dr. Shafer such efforts would have revealed either: (a) that the residue had been tested and that it contained Lidocaine, which would have bolstered the prosecution's Infusion Theory; or (b) Exhibit

39

30 had not been tested, or it had been tested and it did not contained Lidocaine which may have undermined the Infusion Theory, but would not undermine the other possible theories of causation (i.e. the 25 Milligram Theory or the theory that appellant's numerous breaches of the standard of care and abandonment of Mr. Jackson were a substantial factor in Mr. Jackson's death). Whether or not Exhibit 30 was found to contain trace amounts of Lidocaine would have no effect on those causation theories, discussed elsewhere here, that were supported by substantial evidence during the trial. As a result, appellant has not shown that there is a reasonable probability that, but for counsel's errors with respect to Exhibit 30, the result of the proceeding would have been different. We are not convinced that counsel's purported deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair.

## III. The Trial Court Did Not Err in Excluding Testimony Concerning Mr. Jackson's Dermatologist and His Staff, or Evidence of Mr. Jackson's Financial Condition, Pending Lawsuits Against Him and His Contract With AEG

Appellant claims that the trial court erred in excluding testimony from Mr. Jackson's dermatologist, Dr. Klein, and his staff concerning Mr. Jackson's treatment with Demerol, evidence of Jackson's financial circumstances and the litigation pending against him and his contract with AEG. Appellant claims that these errors violated his constitutional due process rights, including his rights to a fair trial and to present a defense.[24] As we shall explain, the court properly excluded these matters from the trial as distracting and unduly time consuming under California Evidence Code Section 352.

_____

[24] With respect to this and virtually every other claim raised on appeal, appellant contends that the error infringed on his constitutional rights. As the Supreme Court noted in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional legal consequence of violating the

### A. Legal Standards Governing Relevance and Evidence Code Section 352

Relevant evidence is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. (*People v. Bivert* (2011) 52 Cal.4th 96, 116-117, 127.) Only relevant evidence is admissible, and, except as otherwise provided by statute, all relevant evidence is admissible (Evid. Code, §§ 350, 351; see also Cal. Const., art. I, § 28, subd. (d).) "[T]he trial court has broad discretion to determine the relevance of evidence." (*People v. Cash* (2002) 28 Cal.4th 703,727.) This discretion extends to evidentiary rulings made pursuant to Evidence Code section 352. (*People v. Tully* (2012) 54 Cal.4th 953, 1010.)

Evidence Code section 352 provides: "the court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create as substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Evidence Code section 352 justifies the exclusion of evidence that would prolong the trial and distract the jury from the task of deciding the defendant's guilt. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 664-665 [holding that the trial court properly excluded evidence relating to misconduct and civil rights lawsuits against the defendant's colleagues because the minimal relevance of that evidence was substantially outweighed by the risk of jury confusion and undue consumption of time]; *People v. Dement* (2012) 53 Cal.4th 1, 51 [finding no abuse of discretion under Evidence Code section 352 where the trial court excluded as unduly time consuming evidence of defendant's cellmate's

---

Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none."

statements made 20 years before the crime, which were offered to impeach the cellmate's testimony].)

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time.  [Citation.]  Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.  [Citations.]'  [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125, italics in original; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369-1370.)  It is appellant's burden on appeal to establish an abuse of discretion and prejudice.  (*People v. Jordan* (1986) 42 Cal.3d 308, 316.)

### B.        Exclusion of Testimony of Dr. Klein And His Staff

#### 1.        Factual Background

Prior to trial, the prosecution filed a motion *in limine* to exclude any testimony from Dr. Arnold Klein, Mr. Jackson's dermatologist, and two of Dr. Klein's staff members.  The coroner's office had issued a subpoena for Mr. Jackson's medical records maintained by Dr. Klein.  The parties were in receipt of the responsive medical records which showed in the months and weeks before Mr. Jackson's death, Dr. Klein had administered Demerol to Mr. Jackson at Dr. Klein's office in progressively larger doses. The prosecutor point out that the defense had indicated that it had not interviewed Dr. Klein.

At the hearing on the motion, the prosecutor stated his belief that at trial the appellant would seek "to shift the blame to Doctor Klein so that the jury will focus on the activities of Doctor Klein rather than the activities of [appellant]."  However, the medical evidence, the prosecutor argued, did not support a theory of third-party culpability.  The prosecutor also stated that he would not be objecting to a defense expert relying on Dr. Klein's medical records as a basis for the expert's testimony.  The prosecutor noted the records would allow the defense to show when and how much Demerol Dr. Klein had

administered to Mr. Jackson. The prosecutor argued that Dr. Klein's testimony (and that of his staff) was irrelevant and any probative value would be substantially outweighed by the risk of prejudice.

Appellant argued that Dr. Klein's treatment of Mr. Jackson was relevant evidence: "Due to Dr. Klein's unconscionable actions, Mr. Jackson became physiologically and psychologically dependent on Demerol." Appellant pointed out that his medical experts would testify that one of the side effects of Demerol addiction and withdrawal was insomnia. Appellant maintained that a disputed issue at trial would be whether Mr. Jackson was addicted to Demerol and the proffered evidence had a tendency of proving that disputed fact. Appellant further argued that testimony from Dr. Klein was relevant independent of the medical records, because the records would not explain why Dr. Klein chose to prescribe Demerol to Mr. Jackson. Appellant claimed that he was not attempting to shift blame to Dr. Klein but was merely interested in Mr. Jackson's addiction to Demerol.

The trial court granted the motion to exclude any testimony from Dr. Klein and his staff, stating: "I do not think it is relevant in the overall scheme of things in view of the People's acknowledgement that they will not be objecting to the medical records themselves." The court also observed that the testimony: "does raise the issue and specter of so-called third party culpability where one is led down a path of somehow ascribing to Doctor Klein some sort of criminal culpability for the death of Mr. Jackson," and that the appellant had not made a sufficient showing of the relevance of third-party-culpability testimony. Accordingly, the trial court concluded the evidence was irrelevant and "more importantly, under Evidence Code section 352, the distraction and divergence of the issues substantially outweigh any probative value."

## 2. Analysis of Appellant's Arguments

The trial court did not err in excluding the testimony of Dr. Klein and his staff.

Preliminarily, we question the relevance of testimony from these witnesses. The jury was asked to decide whether appellant committed criminal negligence in administering Propofol injections to Mr. Jackson, and specifically whether appellant, who

43

admittedly treated Mr. Jackson with Propofol on June 25 caused his death.  The facts (a) that Mr. Jackson suffered from insomnia—a matter not in dispute at trial; (b) that he was treated with increasing amounts of Demerol in the months before his death as shown by Dr. Klein's records at trial; and (c) that Mr. Jackson may have been addicted to Demerol and showed symptoms of withdrawal from the drug in the days prior to June 25, are not material to an assessment of the appellant's culpability.  There was no dispute that appellant treated Mr. Jackson with Propofol before he died.  However, the reason that appellant treated Mr. Jackson using Propofol was a collateral matter to appellant's culpability.  Appellant administered Propofol to treat Mr. Jackson's insomnia, but the fact that Mr. Jackson suffered from a lack of sleep and its purported cause—his alleged addiction and withdrawal from Demerol—does not inform the jury's determination of appellant's criminal negligence in treating Mr. Jackson.  Why Dr. Klein gave Demerol to Mr. Jackson in the months and weeks before his death is tangential to the material issues in the case.  Appellant did not demonstrate that Dr. Klein or his employees could testify to Mr. Jackson's purported addiction to Demerol or that he was suffering from withdrawal the day Mr. Jackson died.  Moreover, Demerol was not found in Mr. Jackson's autopsy or toxicology results; it did not cause or contribute to Mr. Jackson's death.

Notwithstanding this analysis, the fact that Dr. Klein had prescribed Mr. Jackson Demerol in the months before his death is arguably material to the theory of appellant's defense--that Mr. Jackson was so desperate from the Demerol withdrawal symptoms that he self-administered the lethal dose of Propofol.  As a result, we cannot conclude that Demerol evidence was in fact irrelevant.

Assuming that Mr. Jackson's use of Demerol and its effects was relevant to appellant's defense, we nonetheless conclude that testimony from these witnesses was unnecessary and cumulative in view of the other evidence presented on these issues.  Dr. Klein's records documenting Mr. Jackson's use of the drug were presented at trial.  Appellant's addiction expert used the medical records to opine that Mr. Jackson was addicted to Demerol, and that a withdrawal symptom of Demerol was insomnia.  As a

44

result, appellant used the Demerol evidence to support his defense. Appellant has not suggested how testimony from Dr. Klein and his staff would have assisted his case. Exclusion of these witnesses did not prevent appellant from presenting this theory that Mr. Jackson self-administered the drug.

Appellant's arguments to the contrary are unavailing. Appellant's claim that he could not interpret or challenge the completeness of the medical records absent Dr. Klein's testimony is undermined by appellant's expert's conclusion that based on the information disclosed in the records provided it appeared that Mr. Jackson was in fact addicted to Demerol. It is unclear how from appellant's perspective Dr. Klein's testimony could have improved upon that expert's opinion.

Appellant also claims that Dr. Klein's staff would have testified that two weeks before his death Mr. Jackson asked Dr. Klein to arrange for an anesthesiologist to administer Propofol to him. However, appellant has not demonstrated how this testimony added anything new to the evidence presented that Mr. Jackson wanted to take Propofol and sought out the drug from a number of medical providers.

Finally, evidence of Mr. Jackson's efforts to obtain Propofol and his use of Demerol suggest Mr. Jackson's desperate state of mind, which appellant claims drove him to self-inject. However the evidence necessary to assert this "state of mind" argument was presented to the jury. Appellant has not shown how having these witnesses would have done anything other than lengthen the trial. To that end, the trial court properly concluded that the probative value of that testimony was outweighed by the consumption of time and the distraction of the jury under Evidence Code section 352.[25]

---

[25] Even though appellant's counsel disclaimed any effort to suggest third party culpability, the presentation of these witnesses raised that possibility.

45

**C.      Exclusion of the Financial Evidence, Lawsuits and the AEG contract**

Appellant argues that the trial court erred in granting the prosecution's motion *in limine* to exclude evidence of Mr. Jackson's financial condition and other lawsuits against him, and in failing to allow him to present the AEG contract to the jury.

**1.      Background**

**a.      Evidence of Mr. Jackson's Finances and Lawsuits**

Prior to trial the prosecution filed a motion *in limine* to exclude evidence of any lawsuits or claims pending against Mr. Jackson, as well as evidence of Mr. Jackson's finances, arguing that such evidence was irrelevant to the jury's determination of appellant's role in Mr. Jackson's death.

Appellant argued that evidence of Mr. Jackson's dire financial situation, and the lawsuits pending against him were relevant to Mr. Jackson's state of mind. He posited that Mr. Jackson was so desperate at the time of his death that it may have caused him to take actions that he might not otherwise have taken. Appellant's lawyer argued: "State of mind for every individual is dependent on the circumstances of their life. Finances is one of those circumstances. . . . Mr. Jackson's entire financial situation at the time he signed the A.E.G. contract was so dire that he couldn't even pay his own lawsuit settlements." Counsel wanted to present evidence that at the time of Mr. Jackson's death, there were 38 lawsuits filed against him for millions of dollars; Mr. Jackson owed millions of dollars in taxes and had not filed tax returns for a number of years; Mr. Jackson could not afford to pay a legal settlement; and that Mr. Jackson owed AEG Live $40 million. Appellant sought to present documents from Mr. Jackson's probate estate which showed his financial circumstances and offered to present a financial expert to explain Mr. Jackson's financial situation at the time of his death.

The trial court excluded the evidence of Mr. Jackson's finances and the lawsuits against him as irrelevant and inadmissible under Evidence Code section 352. As to the lack of relevance, the court observed that: "People react to the pressures in life and the other realities of life in very different ways. And to present a picture that someone may be experiencing financial pressure . . . does not address that. It causes speculation;" and

46

that evidence exemplified "exactly the evil which Evidence Code section 352 cautions trial judges to avoid." The court stated that if the evidence were admitted,

> "[o]ne would have all sorts of obtuse testimony regarding contractual issues and accounting issues which would turn what should be a focused trial involving a charge of involuntary manslaughter into a salacious analysis of personal financial issues. . . . [the evidence would] cause[ ] divergence and . . . an extraordinary consumption of time and distraction in a case which diverts and distracts the jury to no end."

### b. Mr. Jackson's Contract With AEG

During the trial, appellant filed a motion seeking to admit Mr. Jackson's AEG contract into evidence, arguing that the contract was relevant to Mr. Jackson's state of mind because it showed Mr. Jackson's stake in the "This Is It Tour," the advances Mr. Jackson had been paid by AEG and the consequences if he failed to satisfy the terms of the deal. Appellant argued that Mr. Jackson was under tremendous pressure because of the contract, which lent support to appellant's theory that Mr. Jackson self-administered Propofol. Appellant attached the 14-page contract and 25 pages of various exhibits that were apparently part of the contract.

At the hearing on the motion, appellant's counsel pointed out that pursuant to the contract Mr. Jackson was responsible for all production costs (totaling $40 million) if the tour did not take place. Appellant argued that the contract was relevant to show why Mr. Jackson would feel so desperate that he would self-administer Propofol. Appellant stated that other than Randy Phillips, who had signed the contract on behalf of AEG Live, he had no other witnesses to call to testify about the terms of the contract.

The prosecutor countered that the admission of the contract was not relevant and its admission would turn the case into a "mini-trial" of Mr. Jackson's finances. The prosecutor also pointed out that the contract was "full of legalies [sic] and complex terms that would just lead the jury to inappropriately speculate as to their meaning. It would involve the jury trying to determine complex paragraphs and financial obligations and liens and notes and things of that nature . . . ."

47

During oral argument on the motion, the trial court asked appellant's counsel if there was any evidence that Mr. Jackson had expressed specific concerns about the financial consequences of any failure to meet his obligations under the contract, or if there was any evidence that Mr. Jackson's actions were governed by a financial motivation, as opposed to a performance motivation. The court observed that "there are people who . . . put reputation or performance ahead of financial success. There are people all around the world everyday who do things and don't do things for reasons other than money. . . ." Counsel did not identify any evidence that Mr. Jackson had voiced such financial concerns or motivations.

The trial court refused to admit the contract between Mr. Jackson and AEG Live, or testimony regarding the financial aspects of the tour. The court found the evidence was irrelevant: "There is a tremendous amount of speculation involved in the defense proffer here in terms of the issues of performer versus profit, in terms of trying to speculate as to motivations of Mr. Jackson or anybody else that may or may not be borne by the evidence."

The court also found the evidence inadmissible pursuant to Evidence Code section 352 because the contract involved complicated legal terminology, and would be distracting to the jurors and time consuming. The court stated that the proffered evidence "involve[d] the factfinder getting taken on a side tour of accounting principles and law school. . . ." The court further explained: "This is not a contractual dispute. This is a homicide case. And while the court has allowed some latitude . . . in this regard, this type of evidence simply is not admissible. . . ."

### 2. Analysis of Appellant's Arguments

Before this court appellant argues that the trial court abused its discretion in excluding this evidence. Appellant contends the evidence was relevant to establish Mr. Jackson's state of mind, which may have explained his conduct that morning, and supported appellant's "Self-Administration Theory" of the case.

The court did not abuse its discretion when it excluded evidence of Mr. Jackson's finances, the lawsuits against him and his contract with AEG. Even assuming the

48

relevance of the evidence to appellant's defense, appellant failed to make any offer of proof or present any evidence that stress or strain caused by Mr. Jackson's finances, the lawsuits or the contract had any particular effect on Mr. Jackson. As the trial court observed, people react to the pressures of life in various ways and to present evidence that a person has financial difficulties does not address how that person might act in any given situation. There was no foundation presented for the belief that Mr. Jackson would lose sleep or feel stressed because of his finances, the lawsuits or the terms of the contract; and absent such foundational facts, this evidence would only have invited the jury to conjecture as to Mr. Jackson's state of mind. The relevance of this evidence was, as a result, limited at best.

The court did not abuse its discretion in excluding the evidence under Evidence Code section 352. Appellant concedes that the presentation of this evidence would consume too much time. Appellant sought to present complicated financial documents, various court documents and other evidence about third-party civil lawsuits, a lengthy and complex performance contract with AEG and testimony from a financial expert to help the jury interpret Mr. Jackson's finances. We have no doubt presentation of this evidence would not only have lengthened the trial considerably, but it would have also caused a distraction and a sideshow about Mr. Jackson's life's circumstances which had little or no relevance to the issues of guilt before the jury.

Finally, in any event, error with respect to these matters is harmless. All three of these evidentiary matters – Mr. Jackson's finances, the lawsuits and the AEG contract – pertain only to the appellant's "Self-Administration Theory" of causation. The excluded evidence did not relate to the other negligence theories—that is, that appellant administered the lethal dose, engaged in poly-pharmacy and/or breached his duties as a doctor and abandoned Mr. Jackson. As discussed elsewhere here, overwhelming evidence supported the other causation theories and also supported the conclusion even if Mr. Jackson did self-administer Propofol his conduct was foreseeable and did not immunize appellant from liability for Mr. Jackson's death. Thus, any error with respect to the exclusion of this evidence is harmless under any standard of prejudice.

49

**IV.    The Trial Court Did Not Err in Denying Appellant's Motion to Sequester the Jury**

Appellant claims that the trial court erred in denying his motion to sequester the jury.  As a result of this error, appellant contends that his constitutional rights to due process, a fair trial, and to a fair and impartial jury were violated.  The Attorney General responds that the claim should be rejected under the doctrine of the law of the case, and in any event, the trial court did not err in denying the motion.

**A.    Background**

Before trial, appellant filed a motion to sequester the jury for the entirety of the trial.  In that motion, appellant noted that this is "an unusual case" that has attracted "unprecedented media coverage" and that this trial may be "the most publicized in history."  Because of the nature of the case, appellant concluded that "it is Pollyanna to expect the jury members to go home each workday and weekend for six weeks and entirely avoid the mass of exposure this trial will engender."

To support this argument, appellant cited to the recent case of *State of Florida v. Casey Anthony*.  Specifically, appellant contended that *Anthony* "demonstrated the danger that is created to a fair trial when basic information is managed for the purpose of entertainment and television ratings."  Further, appellant argued that were it not for the sequestration of the jury, jurors "would have been affected" by the "television pundits [that] used airtime to campaign for the conviction of Ms. Anthony, questioned her lawyer's ability, and provided nightly 'expert panels' who explained to the audience what they should have heard and believed during the daily testimony."

As to cost, appellant argued that the cost of sequestration would be less than that of a retrial.  Appellant claimed that due to the ubiquity of the Internet, "[e]very court appearance in this case ha[d] drawn extensive internet coverage" and that coverage would only "intensify."  Appellant expressed concern that "[e]very evidentiary ruling by the [c]ourt ha[d] been reported and analyzed" on internet sites up to that point.  Because of the prevalence of the internet appellant believed partial sequestration would be ineffective because the "possibilities are endless for jurors" to conduct independent

50

internet research. Therefore, appellant requested sequestration for the entire trial. Appellant opined, "[i]f this isn't the proper case for sequestration, then there really is not a proper case for sequestration."

The People did not file a written opposition to the motion, but the prosecutor argued at the hearing on motion that sequestration was unnecessary. The prosecutor urged the judge to grant the jury "some level of trust" and recognize that the jurors are "citizens coming in to do their duty" rather than "inmates completely removed from everything."

The trial court denied the motion for sequestration. To allay appellant's concerns, the trial court explained that it would regularly admonish the jury to avoid contact with media coverage of the case and "implore the jury to take the high road." The court assured the defense that the admonitions would be both oral and in writing and would inform jurors that a failure to follow the court's admonitions would result in serious consequences, including contempt of court and fines. The court expressed that admonitions rather than sequestration would "provide [the jurors] with a sense of dignity and a sense of responsibility which they will acknowledge and, in return, demonstrate to the participants in this case."

The court further explained that "if anything, [sequestration] would be. . . more of a problem for individual jurors." Anecdotally, the court noted that "sequestered jurors have indicated they felt like inmates." The court expressed concern that "the sequestration process was so frustrating, so intimidating, so cruel and so unusual" that in some cases it has the opposite of its intended affect and "actually interfere[s] with [the jury's] fair assessment of the evidence and the law[.]"

The court noted that "justice trumps everything," and "[i]f this were a close call" it would not hesitate to sequester the jury, "regardless of cost." However, the court explained that the "extraordinary financial impact, that again weighs so heavily in terms of not sequestering the jury on a 24/seven basis." Though the court denied the motion, it explained:

51

"This court is going to have very strict rules and regulations which are going to be provided to the jurors. The jurors are going to be eating their meals and snacks in the jury room during the court day so the jurors will not be roaming free during the court day. That causes me enough concern as it is."

At the end of every day of trial, the trial court admonished the jury to not: (1) come into contact with any media outlet regarding any of the topics, persons, or matters discussed in trial that day or (2) access independently or through another person any research materials, including search engines or social media sites, such as Google and Facebook, regarding any of the topics, persons, or matters discussed in trial.

Following the denial of the motion, appellant filed in this Court a "Petition for Writ of Mandate and/or Other Extraordinary Relief and for a Stay of Trial." On September 7, 2011, we denied the petition and request for a stay, stating, "[t]he petition is denied in the absence of a showing of abuse of discretion."

**B.     The Law of the Case Doctrine Does Not Bar Appellant's Claim**

Preliminarily we address the Attorney General's argument that because this Court denied appellant's writ petition seeking reversal of the trial court's order denying the motion to sequester the jury that the law of the case doctrine applies, foreclosing additional review of the matter.

The doctrine of law of the case provides that an appellate court that states a principle or rule of law in deciding an interlocutory appeal is subsequently bound to that statement of law in deciding future actions on the same claim. (*People v. Stanley* (1995) 19 Cal.4th 764, 786.) In general the doctrine will apply unless the appellant shows adherence to the doctrine will produce an unjust result or an intervening decision alters or clarifies the earlier decision. (*Id.* at p. 787.) However, if an appellate court does not enunciate a principle of law in deciding an interlocutory appeal, the law of the case doctrine does not affect future claims on the issue appealed. Therefore, "[a] summary denial of a writ petition does not establish law of the case[.]" (*Kowis v. Howard* (1992) 3 Cal.4d 888, 899.)

52

Here this court summarily denied appellant's petition for writ of mandate. Specifically, our order states: "[t]he petition is denied in the absence of a showing of abuse of discretion." In view of the summary denial of the writ petition, we conclude the law of the case doctrine does not apply.[26] Thus, we proceed to consider the merits of appellant's claim.

### C.     The Order Denying the Motion to Sequester the Jury

Penal Code section 1121 provides: "The jurors sworn to try an action may, in the discretion of the court, be permitted to separate or be kept in charge of a proper officer." Thus, a trial court's decision whether to sequester the jury is reviewed for abuse of discretion. (*People v. Gallego* (1990) 52 Cal.3d 115, 198.) "The fact that jurors may be aware that publicity exists in a case does not of itself mean they cannot be fair and impartial." (*People v. Hernandez* (1988) 47 Cal.3d 315, 338, citations omitted.)

Mr. Jackson's stature as an acclaimed entertainer undeniably generated more interest in appellant's trial than the average criminal proceeding. However, "the trial court stands in the best position to evaluate the necessity of sequestration in a particular case." (*People v. Ruiz* (1988) 44 Cal.3d 589, 616.) The record reflects that the trial court considered factors weighing in favor and against sequestration. Chief among the trial court's concerns was the possibility that sequestration could have the "opposite [of] its intended effect" and "actually interfere[] with [the jury's] fair assessment of the evidence and the law[.]" At the time of the court's decision, the trial was estimated to be five weeks. The court may consider a lengthy trial to be a factor weighing against sequestration. (See *People v. Hernandez, supra*, 47 Cal.3d at p. 336 ["This jury faced a lengthy trial estimated to be four to six weeks. Clearly the trial judge did not abuse his discretion in denying the motion for sequestration."].)

---

26     The Attorney General has provided no legal support for the contention that the law of the case doctrine applies to the summary denial of a writ petition, and in fact, as our analysis indicates, the California Supreme Court has found to the contrary. Accordingly, we question the wisdom of making this argument, which given its explicit rejection by the Supreme Court, appears to be frivolous.

53

Furthermore, an examination of the trial court's actions following the denial of the motion shows that it took steps to insulate the trial from outside influences. As appellant concedes, the court repeatedly admonished the jury to avoid contact with any media regarding the case. The court also informed jurors that those found in violation of the court's directives could be "held in contempt of court, sentenced to jail, or both."

Much of appellant's argument is premised on the substantial media coverage of the trial. Defendant speculates that given the amount of publicity, "it was highly probable that jurors were exposed to media coverage of the case[.]" Such a conjectural argument is insufficient to support a claim of abuse of discretion. (*People v. Gallego, supra,* 52 Cal.3d at pp. 193-194.) In *Gallego*, the defendant argued "although no juror reported he or she disobeyed the court's orders, it stretches the imagination to believe the jury could have been successfully insulated from the extensive media coverage[.]" (*Ibid.*) The *Gallego* Court refused to find an abuse of discretion on the defendant's mere speculation. (*Ibid.*) Without a showing that jurors disobeyed a court directive, we must assume that jurors complied with the court's orders. (*People v. Clark* (2011) 52 Cal.4th 856, 956.) Thus, we cannot find the trial court abused its discretion based on appellant's arguments.

In any event, even if the court had erred, appellant must show that the error resulted in actual prejudice. Despite appellant's contentions to the contrary, California jurisprudence "requires some showing of actual prejudice in order to complain of denial of a motion to sequester the jury." (*People v. Ruiz, supra,* 44 Cal.3d at p. 616; *People v. Santamaria* (1991) 229 Cal.App.3d 269, 279-280, fn. 8 ["[W]here the court has discretion to allow [separation], usually the burden is on the defendant to prove actual prejudice."].) Appellant cites no instances where a juror was exposed to newspaper articles, television programs, or websites to rebut the presumption that the jurors heeded the court's admonitions. Without any showing to the contrary, "we cannot assume on a silent record" that the jury ignored the court's repeated directives or that any other prejudice resulted. (*People v. Ruiz*, *supra*, 44 Cal.3d at p. 617.)

## V. The Trial Court Properly Denied Appellant's Motion to Exclude Cameras From the Courtroom

Appellant contends that his motion to exclude cameras from the courtroom was improperly denied in violation of his right to due process.[27] As we shall explain, we disagree.

---

[27] Appellant contends that the error is reversible per se as a violation of his due process rights. However, "The United States Supreme Court has presumed prejudicial violation of due process in cases where the influence of the media was so pervasive as to render the trial 'a hollow formality,' conducted in a circus atmosphere or in 'a courthouse given over to accommodate the public appetite for carnival.'" (*People v. Famalaro* (2011) 52 Cal.4th 1, 33, quoting *Rideau v. Louisiana* (1963) 373 U.S. 723.) Prejudice will only be presumed in the most extreme cases. (*Skilling v. United States* (2010) 561 U.S. 358; 130 S.Ct. 2896.) *Skilling* offers *Sheppard v. Maxwell* (1966) 384 U.S. 333 and *Estes v. Texas* (1965) 381 U.S. 532 as cases warranting a presumption of prejudice. (*Skilling v. United States, supra,* 561 U.S. 358; 130 S.Ct. 2896.)

In *Sheppard,* the defendant's trial was plagued by "virulent" pre- and post-trial publicity and media coverage. (*Sheppard v. Maxwell*, *supra*, 384 U.S. at p. 354.) The courtroom was so densely packed with reporters that it was often difficult for witnesses to be heard and nearly impossible for the defendant to hold a confidential conversation with defense counsel during the trial. (*Id.* at p. 344.) Because the courtroom was so impacted with news outlets, the judge lost complete control of the courtroom, leading to incidents where reporters were handling exhibits and reporters in the judge's anteroom overheard and published conversations between the judge and counsel in chambers. (*Id.* at pp. 344, 358.)

Similarly, the media coverage in *Estes* resulted in the "bombardment of the community with the sights and sounds of a two-day hearing during which the original jury panel, the petitioner, the lawyers, and the judge were highly publicized." (*Estes v. Texas, supra*, 381 U.S. at p. 538.) A tangle of microphone and camera wires connected to devices that were "beamed at the jury box and counsel table" resulted in "considerable disruption of the hearings." (*Id.* at p. 536.) The Court concluded that the hearing "was not one of the judicial serenity and calm to which the petitioner was entitled." (*Ibid.*)

As the *Skilling* Court concluded, the Court has been willing to overturn convictions only in instances where the "conviction [was] obtained in a trial atmosphere that [was] utterly corrupted by press coverage." (*Skilling v. United States, supra,* 561 U.S. at p. __; 130 S.Ct. at p. 2914.) There is no indication that appellant's trial suffered from the same degree of "virulent" publicity in *Sheppard* or "not one of judicial serenity

## A.	Background

Before trial the court granted a third-party motion to allow cameras in the courtroom to televise certain portions of the trial.  At the time, neither the People nor the defense opposed the motion

Following the court's denial of the defense's motion to sequester the jury, appellant asked the court to revisit its ruling regarding the motion to allow cameras in the courtroom.  Defense counsel expressed a concern about the jurors being affected by the media coverage, but counsel made no mention of the effect of the media on witness testimony.  Appellant's counsel stated television commentators could affect the trial as "quasi jurors" and suggested the court amend its ruling so that "perhaps testimony [would not] be presented on camera."  The court denied appellant's request, citing the importance of the First Amendment in public trials.  The court assured appellant that jurors would be admonished and witnesses would be excluded from the courtroom and admonished not to discuss the case with other witnesses.

During trial, Coroner Investigator Fleak testified that she had watched some of the trial, but not "in detail or regularly."  In addition, Mr. Jackson's personal assistant testified that he had heard on the news an audio recording of Mr. Jackson's voice, though he was instructed not to view the trial on television.  Several other witnesses gave interviews during the trial.

On November 1, 2011, Juror No. 7 received an email that indicated the sender was her "teammate on the jury" and wanted to know "what was happening."  It was believed that the e-mail may have been sent from a member of the media.  After the email was brought to the court's attention, Juror No. 7 assured the court that the email would not

and calm."  Appellant does not contend that the media presence at trial was so egregious that it created a circus-like atmosphere.  As noted in *Skilling*, "[p]rominence does not necessarily produce prejudice[.]"  (*Skilling v. United States, supra,* 561 U.S. at p. __; 130 S.Ct. at pp. 2914-2915.)  Thus, without a showing commensurate with *Sheppard* and *Estes*, any error with regard to the motion to exclude cameras is not entitled to a presumption of prejudice.

affect her ability to serve as a juror. The court proceeded to question every juror regarding the email and whether it would impact his or her ability to serve. No juror answered that the email would have any effect.

## B. Appellant's Claims

Appellant argues that the denial of his motion to exclude cameras from the courtroom is reversible error. Appellant's claim is two-pronged: (1) the media's presence in the courtroom impacted juror impartiality, as indicated by the email received by Juror No. 7; and (2) that the trial court erred in failing to insulate the witnesses from the media.[28] We find neither of these arguments persuasive.

Aside from speculation that it was "unlikely" that jurors avoided all contact with the media during trial, appellant can only cite to one incident. However, the email received by Juror No. 7 does not prove prejudice. Juror No. 7 brought the email to the court's attention, and the court promptly addressed the incident. This incident indicates that the jury vigilantly followed the trial court's order to consider only the evidence presented in court. The court took action and questioned every juror as to the impact of the email on his or her ability to remain impartial. In addition to the court's handling of this particular incident, the record reflects that the court went to great lengths to give daily admonitions that instructed the jury to avoid contact with the media. Juror No. 7's handling of this email only buttresses our assumption that the jury followed the court's directives.

Likewise, appellant's argument that the court failed to protect witnesses from media exposure is also unavailing. When considering the influence of media on criminal proceedings, the Supreme Court of the United States has indicated, "[t]he potential impact of television on the jurors is perhaps of the greatest significance." (*Estes v. Texas*, *supra*, 381 U.S. at p. 545.) That is not to say that the court cannot or has not considered

---

[28]   As respondent points out, it appears that in the trial court appellant did not object to the presence of cameras in the courtroom on the basis that it might affect witness testimony. Thus, appellant has technically forfeited this claim on appeal. Nonetheless, we exercise our discretion to address the merits.

57

the effects of pervasive press coverage on witnesses in the past, but rather that jury impartiality is the predominate concern when addressing claims of undue media influence. The concern of media exposure with regards to witnesses is less than that with jurors because of their different roles in trial. Witnesses often come in with preexisting opinions. "[E]very case of public interest is, almost as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found. . . who has not some impression or some opinion in respect to its merits." (*Reynolds v. United States* (1879) 98 U.S. 145, 155-156.) One reason the trial process permits cross examination is to expose such biases and allow the jury to weigh their import. Such a system allows the finder of fact to consider witness credibility and mitigates the danger of preexisting bias.

Media exposure is similar to other matters that affect witness credibility and, as with other matters affecting witness bias, it is subject to cross examination. Appellant concedes that some[29] witnesses were questioned as to whether they had been exposed to press coverage of the appellant's trial. The jury was permitted to hear the answers and consider their impact on the credibility of the witnesses. It is counsel's, not the trial court's, duty to inquire into every witness's possible biases.

Appellant further asserts that *Sheppard* imposes a duty on trial courts to insulate witnesses from all media contact during high publicity trials. He relies on a passage in the opinion in which the Court suggests the trial court "should have insulated the witnesses," and its failure to do so nullified its order to exclude witnesses. (*Sheppard v. Maxwell, supra,* 384 U.S. at p. 359.) Appellant's conclusion seems to be that the Supreme Court has imposed a duty on the trial court to insulate witnesses from the media. However, appellant takes this passage out of context. The media presence in *Sheppard* was a spectacle. The quoted section appellant relies on is one of the corrections the Court recommended the trial judge make to alleviate the media's impact on the case in light of

---

29     Those instances where trial counsel did not inquire into media exposure are a matter of counsel's legal strategy.

the media's pervasive and intrusive presence in that case. Indeed, the media's contact with witnesses was far more prejudicial to the defendant's case in *Sheppard* than any incident appellant has cited in the instant case. The publications that resulted from the press's interactions with witnesses rose to the level of "inflammatory." (*Sheppard v. Maxwell*, *supra*, 384 U.S. at p. 362.) The *Sheppard* Court noted publications that resulted from witness interviews that included information that was never heard at trial, including allegations that the defendant was purposely impeding the murder investigation, implications of the defendant's guilt based on the prominence of his criminal defense attorney, accusations that he had fathered the illegitimate child of a "woman convict," and "doctored" crime scene photos that appeared to be intended to further incriminate the defendant. (*Id.* at pp. 356-357.)

Appellant has not shown his case suffered from this sort of prejudicial coverage. Appellant asserts, in addition to the email incident, that some witnesses gave interviews before the conclusion of trial and more than one witness admitted to viewing at least some televised portion of the trial. Appellant has not directed the court to any publications or broadcasts that resulted from witness interviews that are comparable to the "inflammatory" publications in *Sheppard* or the content of any publication that we could construe as even remotely prejudicial. Without such a showing, we are not convinced that the media's influence prejudiced appellant's case.

## VI. Appellant Has Not Demonstrated Error with Respect to His Sentence

Appellant claims that the trial court erred in sentencing appellant to the term of four years for his involuntary manslaughter conviction. He asserts that the trial court abused its discretion in sentencing appellant because the high term was not supported by the sentencing factors; the court displayed bias against him; and the sentence did not serve justice.

### A. Background

At the sentencing hearing, the prosecution requested the trial court to sentence appellant to the high term of four years on his conviction for involuntary manslaughter.

59

The prosecution cited four factors pursuant to California Rules of Court, rule 4.421(a) that warranted the high term: (1) crime involved a threat of great bodily harm and disclosed a high degree of callousness and cruelty; (2) appellant made Mr. Jackson vulnerable by making him the subject of a pharmaceutical experiment; (3) the crime involved planning and sophistication; and (4) appellant violated his position of trust by failing to act with independent and appropriate judgment as a doctor. The prosecution also asked the trial court "to consider the defendant's lack of remorse and lack of personal responsibility."[30]

The probation officer's report recommended that the court deny probation and impose the midterm prison sentence. The probation department did not interview appellant in connection with the report.

Appellant asked for probation rather than time in prison or jail. In support of this request appellant pointed out that: (1) he had no prior criminal record; (2) the crime would not likely recur and that he did not pose a danger to the community; (3) that he had acknowledged wrongdoing in the case; and (4) that Mr. Jackson willingly took the medications. Appellant also asked the court to consider his upbringing, and his life and contributions to the community.

At the sentencing hearing, appellant was given an opportunity to speak, but he declined the opportunity to do so. The trial court denied probation and imposed the high term. The court said it had considered the "whole book" of appellant's life, and stated it was "impressed by the submissions from appellant's family, and friends, and associates" and that it appeared that appellant did not intend for Mr. Jackson to die. But the court also observed that the jury had found beyond a reasonable doubt that appellant took Mr. Jackson's life with criminal negligence. The court noted that Mr. Jackson died "because of a totality of circumstances which are directly attributable to" appellant and "which

---

[30] The prosecution attached a DVD copy of media interviews that appellant gave after Mr. Jackson's death in which appellant made statements indicating that he did not feel responsible for Mr. Jackson's death and that he felt entrapped and betrayed by Mr. Jackson.

violated his obligations to his patient and the essence of his Hippocratic oath." The court found that appellant's professional breaches outweighed the positive aspects of appellant's life and career.

The trial court further found appellant engaged in a continuous pattern of deception in regards to his treatment of Mr. Jackson and violation of Mr. Jackson's trust. Referencing appellant's conduct and behavior after Mr. Jackson's death including his statements in media interviews, the court found appellant's lack of remorse and acknowledgement of responsibility was incompatible with probation.

The trial court selected the high term of four years and gave its statement of reasons:

> "The court has determined that the appropriate term is the high term of four years in imprisonment. . . . I find that [appellant] abandoned his patient who was trusting him. His patient was vulnerable under those circumstances, having been administered potentially dangerous drugs by his medical provider. [Appellant's] course of conduct extended over a period of time. [Appellant] repeatedly lied, engaged in deceitful misconduct, and endeavored to cover up his transgressions. . . . And he has absolutely no sense of remorse, absolutely no sense of fault, and is and remains dangerous.
>
> "I think [appellant] is so reckless, based upon the law . . . and everything that I heard and saw in this case . . . that I believe he is a danger to the community. I have taken into account all of the factors. . . . And those reasons, the nature and character of the offense, distinguish this . . . conviction of involuntary manslaughter . . . from other cases involving involuntary manslaughter. And there is a fundamental aspect of the criminal justice system which is involved here. That is, the fundamental aspect of punishment. It should be made very clear that experimental medicine is not going to be tolerated, and Mr. Jackson was an experiment. The fact that he participated in it does not excuse or lessen the blame of [appellant], who simply could have walked away and said, 'no,' as countless others did. [Appellant] was intrigued by the prospect, and he engaged in this money for medicine madness that is simply not going to be tolerated by me."

61

Thereafter, on October 3, 2013, this court requested appellant and respondent to file supplemental letter briefs addressing the effect, if any, of appellant's release from custody during the pendency of this appeal upon appellant's challenge to the term of the sentence imposed by the trial court. The parties informed this court that appellant was scheduled for release on October 28, 2013.[31] The Attorney General expressed the view that appellant's challenge to the term of his sentence would be moot once he was released from custody, and that none of the traditional exceptions to the mootness doctrine would apply—i.e., the appeal of his sentence did not involve a recurring issue that was likely to evade review or an issue of public importance; it would not afford appellant an opportunity to "clear his name" and that appellant did not face adverse collateral consequences related to the imposition of the high term. Appellant conceded that his release would technically render the appeal of the issue moot. Nonetheless, appellant urged this court to exercise its discretion to reach the merits because the collateral adverse consequences of the sentence were unknown, it would give him an opportunity to clear the stigma based upon the sentence and the court's remarks about him during the sentencing hearing, and because the case is a matter of public importance.

## B. Analysis

### 1. Mootness

Preliminarily we turn to the issue of mootness. "As a general rule, an appellate court only decides actual controversies. It is not the function of the appellate court to render opinions upon moot questions or abstract propositions, or . . . declare principles or rules of law which cannot affect the matter in issue in the case before it. [A] case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief." (*People v. Gregerson* (2011) 202 Cal.App.4th 306, 321, internal quotation marks and citations omitted.) Although an appeal may be moot, an appellate court retains discretion to decide it if there is an important public interest

---

[31]     We take judicial notice of the fact that appellant was released from custody on that date. (Evid. Code, §§ 452, subd. (h), 459, subd. (a).)

involved that will continue to recur and evade review. (See e.g., *County of Fresno v. Shelton* (1998) 66 Cal.App.4th 996, 1006.) In addition, in the context of an appellate challenge to the validity of sentence, where the sentence has already been served some courts have allowed appeals to proceed where a successful appeal might give the defendant an opportunity to clear his name or remove the stigma of criminality. (*People v. DeLong* (2002) 101 Cal.App.4th 482, 492.)

Furthermore, an exception to mootness may be found where the defendant can face future adverse collateral legal consequences as a result of the conviction or sentence, such as decreasing the parole period.[32] (See *People v. Harris* (1987) 195 Cal.App.3d 717, 720 [finding the appeal not moot where a disposition favorable on defendant's appellant challenge would constructively move his official release from prison to an earlier date, thereby shortening the period of time to which he is subject to the legal custody and control of the Department of Corrections as a parolee, as well as enhancing defendant's period of nonsuspended parole leading to discharge]; *People v. Ellison* (2003) 111 Cal.App.4th 1360, 1368-1369.)

Similarly, a challenge to a sentence is not moot where if successful it would reduce the time a prisoner is deemed to have been in prison or jail and thus affects the start date of the "wash out" period under Penal Code section 667.5, subdivision (b). (*People v. Harris, supra,* 195 Cal.App.3d at p. 720.) Specifically, Penal Code section 667.5, subdivision (b) provides in pertinent part: "[W]here the new offense is any felony for which a prison sentence or a sentence of imprisonment in a county jail under subdivision (h) of Section 1170 is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term or county jail term imposed under subdivision (h) of Section 1170 or when sentence is not suspended for any felony; *provided that no*

---

[32]     According to the Attorney General appellant did not face a period of parole upon his completion of his sentence because he was sentenced to county jail under Penal Code section 1170, subdivision (h), rather than state prison.

*additional term shall be imposed under this subdivision for any prison term or county jail term imposed under subdivision (h) of Section 1170 or when sentence is not suspended prior to a period of five years in which the defendant remained free of both the commission of an offense which results in a felony conviction, and prison custody or the imposition of a term of jail custody imposed under subdivision (h) of Section 1170 or any felony sentence that is not suspended.*" This phrase in italics is commonly referred to as the "washout rule" where a prior felony conviction and prison term can be "washed out" or nullified for the purposes of Penal Code section 667.5. According to the "washout" rule, if a defendant is free from both prison custody and the commission of a new felony for any five-year period following discharge from custody or release on parole, the one-year enhancement does not apply. (*People v. Fielder* (2004) 114 Cal.App.4th 1221, 1229; Pen. Code, § 667.5, subd. (b); see also 3 Witkin & Epstein, Cal.Criminal Law (3d ed. 2000) Punishment, § 335, p. 433.)

The effect of the appeal on the "wash out" period is implicated in this case.[33] Although appellant's release from custody serves to moot the challenge to his sentence, we nonetheless exercise our discretion to reach the merits of his complaint because appellant may face adverse collateral legal consequences as a result of the sentence. Specifically, the appeal of the sentence, if successful would change the start date of the "wash out" period under Penal Code section 667.5, subdivision (b), in the event appellant sustains a subsequent felony conviction. In view of this conclusion, we reach the issues raised by the parties.

### 2. Waiver.

Appellant contends the trial court abused its discretion when it imposed the high term of four years. Respondent contends any claimed error has been waived because defendant made no objection to the court's imposition of the high term and instead took

---

[33]     To the extent appellant's argument can be read as a challenge to the court's imposition of jail time rather than probation, a disposition favorable to him would leave him not subject at all to a subsequent Penal Code section 667.5 enhancement for the present conviction. (See *People v. Johnson* (1978) 82 Cal.App.3d 183, 189, fn. 5.)

the position in the trial court that only probation should have been imposed.  (*See People v. Scott* (1994) 9 Cal.4th 331, 351-354, 356 ["complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal"].)  Appellant contends he did object to the sentence at the hearing and in his sentencing memorandum.

We agree that appellant's arguments in his memorandum and at the hearing are tantamount to an objection to the trial court's weighing the factors in support of the high term.  On this record, an additional objection after imposition of the high term would have been redundant.  The purpose of requiring an objection to preserve a claim is to promptly prevent and correct errors by calling the court's attention to them.  (*People v. Scott, supra,* 9 Cal.4th at p. 353.)  Appellant's arguments in his memorandum and at the hearing were sufficient to meet this objective.

### 3.	Merits

Nevertheless, we find the trial court did not abuse its discretion in sentencing appellant to the upper term of four years.

A conviction for involuntary manslaughter under Penal Code section 193, subdivision (b) is punishable by imprisonment pursuant to Penal Code section 1120, subdivision (h) for a term of two, three or four years.  (Pen. Code, § 193.)  Whether to impose the upper term is a decision resting in the trial court's sound discretion.  (Pen. Code, § 1170, subd. (b).)  In determining the appropriate term, the court may consider the record in the case, the probation report, evidence introduced at the sentencing hearing, and "any other factor reasonably related to the sentencing decision."  (Cal. Rules of Court, rule 4.420(b).)  The court "shall select the term which, in the court's discretion, best serves the interests of justice."  (Pen. Code, § 1170, subd. (b).)

A trial court may base an upper term sentence upon any aggravating circumstance the court deems significant, subject to specific prohibitions not at issue here.  Moreover, the presence of one aggravating factor is "legally sufficient" to support an upper term sentence.  (*People v. Black* (2007) 41 Cal.4th 799, 813.)  The court's discretion to identify aggravating circumstances is limited only by the requirement they be reasonably

65

related to the decision being made. (*People v. Sandoval* (2007) 41 Cal.4th 825, 848.) The trial court "shall state the reasons for its sentence choice on the record at the time of sentencing." (Pen. Code, § 1170, subd. (c); see also *People v. Sandoval, supra,* 41 Cal.4th at pp. 846–847; Cal. Rules of Court, rule 4.420(e).) However, the court is not required "to cite 'facts' that support its decision or to weigh aggravating and mitigating circumstances," nor must it provide a "'concise statement of the ultimate facts that the court deemed to constitute circumstances in aggravation or mitigation.' [Citations.]" (*People v. Sandoval, supra,* 41 Cal.4th at p. 847.)

A trial court's sentencing decision will not be disturbed on appeal unless it is so irrational or arbitrary that no reasonable person could agree with it. (*People v. Jones* (2009) 178 Cal.App.4th 853, 860; *People v. Carmony* (2004) 33 Cal.4th 367, 377; see also *People v. Sandoval, supra,* 41 Cal.4th at p. 847.) A court abuses its discretion if it fails to exercise its discretion in sentencing, relies upon irrelevant circumstances, or relies upon circumstances that constitute an improper basis for the decision. (*People v. Sandoval, supra,* 41 Cal.4th at pp. 847-848.) The burden is on the party attacking the sentence to show the sentencing decision was irrational or arbitrary, and an appellate court will not substitute its judgment for that of the trial court. (*People v. Jones, supra,* 178 Cal.App.4th at p. 861.) "Even if a trial court has stated both proper and improper reasons for a sentence choice, 'a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper. [Citation.]'" (*Ibid.)*

Here, the trial court was well within its discretion to impose the high term of four years. The court's observations were supported by the evidence in the record of the trial and the evidence submitted in connection with the sentencing hearing. The evidence presented at trial supported a number of aggravating factors under California Rules of Court, rule 4.421(a). Appellant's callous disregard for Mr. Jackson's health and safety was shown throughout the trial from the manner in which he administered a number of dangerous drugs to Mr. Jackson without the appropriate medical equipment, precautions or personnel in place, and to the manner in which he left Mr. Jackson unattended. The

66

evidence demonstrated that Mr. Jackson was a vulnerable victim and that appellant was in a position of trust, and that appellant violated the trust relationship by breaching standards of professional conduct in numerous respects. The evidence also showed that the crime involved planning and sophistication. Appellant ordered large amounts of drugs from out of state, and kept no records of his treatment of Mr. Jackson. Appellant also engaged in a pattern of lies and deception before and after the crime. It appears that he attempted to clean up the crime scene and failed to provide accurate information to first responders and hospital personnel. Appellant gave the police incomplete and misleading information during his interview. Finally, the evidence presented at sentencing showed that appellant failed to take responsibility and displayed a lack of remorse throughout the proceedings.[34]

The court considered the evidence appellant presented in mitigation, including the circumstances of appellant's life, his contributions to his community and the fact that appellant had no prior criminal record. In our view the court did not abuse its discretion in concluding that the aggravating circumstances outweighed those in mitigation to justify the imposition of the high term. Likewise we have found nothing in the record to demonstrate that the trial court was in any way motivated by the celebrity and fame surrounding the case.

Because the trial court did not act in an arbitrary fashion, and properly exercised its discretion when it imposed the upper term, defendant's due process claim is without merit. (See *People v. Hartshorne* (2012) 202 Cal.App.4th 1145, 1153 [due process protects against arbitrary government action].)

## VII. Cumulative Error

We reject appellant's contention that the errors were prejudicial in combination. We have not found any errors in the conduct of the trial, and in the few instances where

---

34    The court properly considered the evidence submitted with the prosecutor's sentencing memorandum, including the DVD containing appellant's statements to the media. (Pen. Code, § 1170, subd. (b) [permitting the court to consider evidence introduced during sentencing].)

we have assumed error for purposes of discussion we have not found prejudice or, indeed, any significant adverse impact.  Even taken together, therefore, such assumed errors were not prejudicial.  (*People v. Price* (1991) 1 Cal.4th 324, 491.)

### *DISPOSITION*

The judgment is affirmed.


**WOODS, J.**


**We concur:**



**PERLUSS, P. J.**



**ZELON, J.**